ORIGINAL

CC: DKW & file

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUL 0 2 2026

at 3 o'clock and 05 min. P M
Lucy H. Carrillo, Clerk

**THEODORE HAUGLAND**
99-009 Kalaloa St #D2016
Aiea, HI 96701
Telephone: 202-933-3332
Facsimile: 202-933-3335
administrator@civillawinc.com

*Plaintiff, Pro Se*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF HAWAII**

**HONOLULU COUNTY DIVISION**

| | |
|---|---|
| THEODORE HAUGLAND<br><br>                     Plaintiffs,<br><br>        v.<br><br>ALPHABET INC., a Delaware corporation, and GOOGLE LLC, a Delaware limited liability company<br><br>                     Defendants. | **CV26 00341 DKW WRP**<br><br>Case No.: [To Be Assigned]<br><br>Judge: [To Be Assigned]<br><br>**ANTITRUST COMPLAINT AND DEMAND FOR JURY TRIAL** |

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

1

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ........................................................... 3-8

II. PARTIES ................................................................................. 8-11

III. JURISDICTION AND VENUE .................................................. 11-13

IV. FACTUAL BACKGROUND ...................................................... 13-41

A. Plaintiff's Online Publishing Business and Internet Publishing Enterprise ............ 13-17

B. The Traditional Search Bargain and Its Systematic Destruction ............................ 17-21

C. Google's Adjudicated Monopoly Power in General Search Services ....................... 21-26

D. Google's Generative AI Expansion and the Deployment of AI Overviews ............... 26-31

E. The Illusory "Opt-Out" — The Hobson's Choice Imposed on Publishers ................. 31-35

F. Google's Exploitation of Plaintiff's Relevant Market —Legal Information Publishing ........... 35-39

G. Google's Systematic Pattern of Anticompetitive Conduct Across Markets ............... 39-41

V. RELEVANT MARKETS .............................................................. 41-44

VI. ANTITRUST INJURY AND STANDING .................................... 44-66

COUNT I — Unlawful Reciprocal Dealing .......................................... 48-51

COUNT II — Unlawful Monopoly Maintenance - Reciprocal Dealing ...... 51-53

COUNT III — Unlawful Monopoly Maintenance -Tortious Content Misappropriation .......... 53-56

COUNT IV — Unlawful Monopoly Leveraging into Adjacent Market ........ 56-58

COUNT V — Unlawful Monopolization of General Search Services ......... 58-60

COUNT VI — Unlawful Attempted Monopolization of Legal Information Publishing ........... 60-63

COUNT VII — Common Law Unjust Enrichment .................................. 63-66

VII. PRAYER FOR RELIEF ............................................................ 66-69

VIII. DEMAND FOR JURY TRIAL ................................................. 69-70

## I. NATURE OF THE ACTION

1. Plaintiff Theodore Haugland is an individual and sole proprietor residing in Aiea, Hawaii. He is the founder and sole operator of Plaintiff's Online Publishing Business, an internet publishing enterprise that produces original, structured, and legally precise civil legal information content — including civil litigation question-and-answer resources, procedural explainers, statute analyses, case law summaries, and practice-area guides — accessible at [Plaintiff's Internet Domain(s), to be identified in discovery]. Plaintiff is not a corporation, limited liability company, or any other formal business entity; he brings this action solely in his individual capacity as a sole proprietor operating an online content publishing enterprise.

2. Over the course of multiple years, Plaintiff has invested substantial time, domain expertise, and personal financial resources to research, write, organize, and publish an original proprietary library of civil legal information content. Plaintiff's internet publishing enterprise covers core areas of civil law accessible to laypersons, including civil procedure, tort law, contract law, property law, consumer protection law, civil rights, landlord-tenant law, and small claims practice. Each article, guide, Q&A resource, and statute analysis published at [Plaintiff's Internet Domain(s), to be identified in discovery] represents original intellectual work product authored or commissioned by Plaintiff and constituting the foundation of Plaintiff's Online Publishing Business. Plaintiff's business model depends upon attracting users to [Plaintiff's Internet Domain(s), to be identified in discovery] through organic search referral traffic, monetizing those visits through display advertising revenues, and reinvesting those revenues into further content development — a model that Defendants' conduct has fundamentally undermined and continues to destroy.

3. This action arises from Defendants Google LLC and Alphabet Inc.'s (collectively, "Google" or "Defendants") exploitation of Google's adjudicated monopoly in the market for General Search Services to coerce online content publishers — including Plaintiff — into providing their proprietary original content for three unauthorized, distinct, and uncompensated secondary uses as a de facto condition of receiving search referral traffic from Google's dominant search engine. These three unauthorized secondary uses are: (1) **Republishing Content**, meaning the direct reproduction of publisher-created content in Featured Snippets, People Also Ask panels, AI Overviews, and related

3

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SERP features displayed on Google's search results pages; (2) **Training Content**, meaning the use of content crawled from publisher websites as training data for the large language models underlying Google's Gemini platform and AI Overviews, without obtaining publisher consent, a license, or any form of compensation; and (3) **RAG Content**, meaning the use of publisher content in real-time retrieval-augmented generation ("RAG") processes to synthesize and generate AI Overview answers displayed on Google's search results pages, again without consent, license, or compensation. Together, these three unauthorized secondary uses constitute a systematic, coercive program of content misappropriation enabled by and inseparable from Google's monopoly power in General Search Services.

4. Google's General Search monopoly was adjudicated by the Honorable Amit P. Mehta, United States District Judge for the District of Columbia, in **United States v. Google LLC**, No. 1:20-cv-03010-APM, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) (the "DOJ Monopoly Decision"). Judge Mehta found, inter alia, that Google holds approximately 89.2% of all general search query volume in the United States — rising to 94.9% on mobile devices — and that Google maintained this monopoly through unlawful exclusive dealing arrangements, including $26.3 billion in default-placement payments to device manufacturers, browser developers, and wireless carriers in the year 2021 alone. Because Google's monopoly has been adjudicated by a court of competent jurisdiction and is a matter of judicial record, Plaintiff need not re-litigate the threshold question of monopoly power and incorporates the findings of the DOJ Monopoly Decision by reference herein. The conduct challenged in this Complaint — the coercive extraction of free content for republishing, AI training, and RAG use — is an extension and continuation of the monopolistic conduct documented in the DOJ Monopoly Decision, exploiting that adjudicated monopoly to extract additional value from the online publishing ecosystem.

5. Google's gatekeeping monopoly over General Search Services means, in practical economic terms, that no online content publisher can operate a commercially viable internet publishing enterprise in the United States without appearing in Google Search results. The internet economy — for online publishers, including Plaintiff — is effectively governed by Google's search index. Publishers that do not appear in Google's organic search results are, for all practical purposes,

4

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

commercially invisible. Google controls approximately 89.2% of all general web searches conducted in the United States, and approximately 94.9% of all mobile searches. Microsoft's Bing, the second-largest general search engine, holds only 3–5% of the U.S. search market. All remaining alternatives — DuckDuckGo, Yahoo, Ecosia, and others — collectively account for less than 5% of additional query volume. No commercially viable alternative to Google Search exists for online publishers seeking to acquire users through organic search referral traffic in the United States.

6. Because of this bottleneck monopoly, publishers — including Plaintiff — face what economists and courts describe as a "Hobson's Choice": provide Google with free content for republishing, AI training, and real-time RAG grounding use, or be effectively excluded from the internet economy. There is no middle ground. The only mechanism available to publishers to prevent Google from extracting their content for these unauthorized purposes is to block Googlebot — Google's web-crawling robot — from accessing their websites entirely, which removes the publisher from Google's search index and destroys any prospect of organic search referral traffic. For Plaintiff's Online Publishing Business, which relies on Google Search for the substantial majority of its user acquisition, blocking Googlebot would be commercially suicidal. This is coercion in the legal sense: Google uses its control over an irreplaceable distribution channel to compel publishers to provide goods — content — without compensation, under implicit threat of exclusion from that channel.

7. Google conditions the delivery of Search Referral Traffic — a product it monopolizes — on publishers also providing their proprietary content for three additional and entirely separate uses without payment: republishing on the SERP, training AI models, and grounding AI Overview responses. This arrangement constitutes unlawful reciprocal dealing under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The historic "access for traffic" exchange — under which publishers allowed crawling in exchange for search result placement, and in which traffic was the entirety of the exchange — has been unilaterally and coercively expanded by Google, using its monopoly power, into a one-sided arrangement in which Google takes four distinct forms of value from publishers: (1) the right to index and list their content; (2) the right to republish that content in SERP features; (3) the right to train its AI models on that content; and (4) the right to use that content in real time to generate AI Overview answers — all without consent, license, or compensation. This

arrangement destroys the price signal for online content and the competitive process by which content publishers have historically been compensated for their creative and editorial investments.

8. The harm to Plaintiff is direct, measurable, and ongoing. Plaintiff's Online Publishing Business historically relied upon Google Search referral traffic as the primary source of user acquisition. Google's May 14, 2024 nationwide rollout of AI Overviews initiated a dramatic and accelerating decline in search referral traffic to [Plaintiff's Internet Domain(s), to be identified in discovery]. Google's AI Overviews now surface direct answers to civil law procedural and substantive questions — questions for which users would previously have clicked through to Plaintiff's website — directly on the search results page, above and instead of the organic results where Plaintiff's content would otherwise appear. As a result, users receive information synthesized from Plaintiff's content without ever visiting Plaintiff's website, depriving Plaintiff of the advertising impressions and user engagements on which his business model depends. This is not incidental displacement; it is the structural, intended operation of Google's AI Overviews product, fueled by content misappropriated from publishers like Plaintiff.

9. Plaintiff's original legal information content — covering civil procedure, tort law, contract law, property law, consumer protection, civil rights, landlord-tenant law, and small claims practice — is particularly valuable as AI training data and RAG grounding context because it is accurate and verifiable, structured for comprehension (in Q&A format, step-by-step procedural guides, and definitional explainers), and covers high-frequency civil legal information queries that Google's AI Overviews are specifically designed to answer. Civil law questions — "What is the statute of limitations for a personal injury claim?", "How do I serve a defendant in small claims court?", "What are the elements of a breach of contract claim?" — are canonical candidates for AI Overview responses because they have factual, structured answers that AI systems can synthesize from authoritative sources like Plaintiff's content. Google's AI Overviews routinely surface answers derived from content of the type Plaintiff publishes, displaying those answers in a prominent AI-generated block at the top of the SERP, above all organic search results, eliminating the click-through to [Plaintiff's Internet Domain(s), to be identified in discovery] and decimating Plaintiff's advertising revenue and user acquisition metrics.

6

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**10.** The harm Plaintiff alleges is not speculative. According to data published by SimilarWeb in May 2025, zero-click searches — queries in which no user clicks through to any external website — rose from 56% to 69% of all Google queries between May 2024 and May 2025, the twelve-month period following the AI Overviews rollout. Gartner Research predicted in February 2024 that overall search volume would decline by approximately 25% by 2026 as AI-generated answers replace traditional search referrals, directly harming publishers dependent on organic search. A March 2024 study by Raptive, a major publisher advertising network, projected that the AI Overviews rollout would produce traffic declines of 20% to 60% for online content publishers across categories. These industry-wide data points are consistent with and compound the specific harm Plaintiff has experienced and continues to experience at Plaintiff's Online Publishing Business.

**11.** The existence of a fair market rate for the content Google extracts is confirmed by the licensing agreements that Google's AI competitors have entered with publishers. Companies including OpenAI and others have executed content licensing agreements with major media and publishing companies (identities to be established through discovery), demonstrating that a market rate for the right to use publisher content for AI training and retrieval exists and is commercially recognized. Google, uniquely, has declined to pay that market rate, relying instead on its monopoly power over Search Referral Traffic to extract the same content for free. Google is not a participant in the market for licensed AI training and RAG content on equal terms with its competitors; it is a monopolist using an irreplaceable distribution bottleneck to avoid paying market prices that its competitors must pay. This is classic monopoly leverage and constitutes an antitrust violation of the most direct and actionable kind.

**12.** Plaintiff brings this action under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking: compensatory damages — trebled pursuant to Section 4 of the Clayton Act — for all losses sustained as a result of Defendants' anticompetitive conduct; permanent injunctive relief pursuant to Section 16 of the Clayton Act prohibiting continued coercive content extraction and requiring Defendants to compensate publishers at fair market rates for the use of their content for republishing, AI training, and RAG grounding; and, under Hawaii common law, restitution and disgorgement of the unjust

7

profits Defendants have obtained through the unauthorized use of Plaintiff's original content. Plaintiff also seeks reasonable attorneys' fees, costs, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

## II. PARTIES

13. Plaintiff **Theodore Haugland** is an individual and sole proprietor residing at 99-009 Kalaloa Street, Suite D2016, Aiea, Hawaii 96701. Plaintiff is the founder and sole operator of Plaintiff's Online Publishing Business, an internet publishing enterprise that produces, maintains, and publishes original civil legal information content accessible at [Plaintiff's Internet Domain(s), to be identified in discovery]. Plaintiff brings this action solely in his individual capacity as a sole proprietor. Plaintiff is not a corporation, limited liability company, partnership, or any other formal business entity. Plaintiff is a natural person who has personally authored and/or commissioned all content published as part of Plaintiff's internet publishing enterprise, who personally operates the technical infrastructure of [Plaintiff's Internet Domain(s), to be identified in discovery], and who personally bears all financial losses caused by the anticompetitive conduct described herein.

14. Plaintiff's Online Publishing Business publishes original content across multiple areas of civil law, including but not limited to civil procedure (filing complaints, serving process, motion practice, discovery, trial preparation, and appeals), tort law (negligence, premises liability, products liability, intentional torts, and personal injury), contract law (formation, breach, defenses, and remedies), property law (ownership disputes, easements, adverse possession, and real property transactions), consumer protection law (unfair and deceptive trade practices, debt collection, and consumer rights), civil rights (Section 1983 claims, discrimination, and constitutional rights of private individuals), landlord-tenant law (eviction procedures, lease disputes, security deposits, and habitability), and small claims practice (filing procedures, evidence presentation, and judgment collection). Plaintiff has invested substantial time, professional expertise, and personal financial resources over multiple years to build this proprietary content library. The specific domain names, individual content titles, web analytics metrics, advertising revenue figures, and related financial data of Plaintiff's Online Publishing Business will be provided to Defendants in discovery under appropriate protective order.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

8

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

15. Defendant **Google LLC** is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google was incorporated in the State of Delaware and is registered to do business and transacts substantial business throughout the United States, including in the State of Hawaii. Google operates the world's dominant general search engine — available to United States users primarily at google.com — as well as the Gemini artificial intelligence platform (previously known as Bard, and available at gemini.google.com and integrated throughout Google's product suite), the AI Overviews feature integrated into Google Search results, the Google Chrome web browser, YouTube, Google Ads, Google AdSense, Google AdX (the Google Ad Exchange), and numerous other consumer and enterprise products and services. Google's annual revenues exceeded $350 billion for Fiscal Year 2024, the overwhelming majority of which derives from search advertising sold adjacent to or within Google's search engine results pages.

16. Google transacts substantial business in the State of Hawaii and throughout the United States, including: (a) selling search advertising, display advertising, and AI-integrated advertising products to Hawaii-based businesses through Google Ads; (b) providing general search engine services to Hawaii residents and businesses; (c) deploying AI Overviews to Hawaii-based users in response to their search queries; (d) crawling, indexing, and storing content from Hawaii-based websites — including [Plaintiff's Internet Domain(s), to be identified in discovery] — using Google's Googlebot crawler; (e) serving AI Overview responses to Hawaii users that incorporate or are grounded by content crawled from Hawaii-based websites; and (f) selling Google AdSense advertising placements to Hawaii-based website publishers. Google's conduct has caused direct, substantial, and foreseeable injury to Plaintiff in the State of Hawaii and in this District, as described herein.

17. Defendant **Alphabet Inc.** is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Alphabet Inc. was created in October 2015 as the holding company of Google LLC pursuant to a corporate restructuring announced by Google co-founders Larry Page and Sergey Brin. Following the restructuring, Alphabet became the publicly traded parent entity of Google LLC and all of Google's subsidiaries.

9

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Alphabet is listed on the NASDAQ Global Select Market under the ticker symbols "GOOGL" and "GOOG" and had a market capitalization of approximately $2.3 trillion as of mid-2025. Alphabet derives nearly all of its operating revenues from Google's products and services, primarily from Google Search advertising and YouTube advertising, both of which are expanding into AI-integrated formats including AI Overview advertising and Gemini-adjacent placements.

18. Alphabet's Chief Executive Officer, Sundar Pichai, simultaneously serves as the Chief Executive Officer of Google LLC. Alphabet and Google LLC share the same leadership team, physical facilities, technology infrastructure, research and development resources, capital allocation decisions, and overarching strategic direction — including the strategic decision to develop, deploy, and expand AI Overviews and the Gemini platform using content crawled from publisher websites. The degree of operational integration between Alphabet and Google LLC is so complete that Alphabet functions as the alter ego of Google LLC for purposes of antitrust liability. Alphabet's Fiscal Year 2024 Annual Report (Form 10-K) discloses capital expenditures exceeding $52 billion for AI infrastructure investments — resources deployed across Google LLC and Alphabet's subsidiary entities — confirming Alphabet's direct financial involvement in and corporate approval of the AI systems that have injured Plaintiff. Alphabet is a proper defendant in this action as the parent corporation that directed, approved, ratified, and financially enabled the anticompetitive conduct described herein.

19. At all times relevant to this Complaint, Alphabet directed, controlled, approved, ratified, and substantially participated in each category of the anticompetitive conduct alleged herein, including: the strategic decision to develop Gemini and AI Overviews as Google's dominant AI products; the decision to use publicly available web content — including content crawled from publisher websites without consent or compensation — to train the large language models underlying Gemini and AI Overviews; the decision to deploy AI Overviews to hundreds of millions of U.S. users beginning May 14, 2024; the decision not to enter content licensing agreements with publishers as competitors have done; and the decision to maintain the exclusive distribution deals found unlawful in the DOJ Monopoly Decision. Alphabet approved each of these decisions at the highest corporate level and allocated the financial resources — exceeding $52 billion in annual AI

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

infrastructure capital expenditures — necessary to execute them. Accordingly, Alphabet and Google LLC are jointly and severally liable for all violations of federal antitrust law and Hawaii common law alleged herein.

20. The anticompetitive conduct of Google LLC and Alphabet Inc., as described in this Complaint, was carried out by officers, directors, employees, and agents of both entities acting within the scope of their authority and in furtherance of the corporate interests of both Google LLC and Alphabet Inc. For the avoidance of doubt, all references to "Google" or "Defendants" throughout this Complaint refer collectively to Google LLC and Alphabet Inc. and their respective officers, directors, employees, agents, successors, and assigns acting in concert.

### III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims pursuant to 28 U.S.C. § 1331, which grants federal district courts original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States, and pursuant to 28 U.S.C. § 1337(a), which grants federal district courts original jurisdiction over civil actions arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. Plaintiff's claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, arise directly under Acts of Congress regulating commerce and protecting trade against restraints and monopolies, conferring original federal subject matter jurisdiction on this Court. This Court has supplemental jurisdiction over Plaintiff's Hawaii common law unjust enrichment claim (Count VII) pursuant to 28 U.S.C. § 1367(a), as that claim forms part of the same case or controversy as Plaintiff's federal antitrust claims, arises from the same common nucleus of operative facts — namely, Google's unauthorized extraction and use of Plaintiff's original content — and is so related to the federal claims that it should be decided by this Court in a single judicial proceeding.

22. Venue is proper in this District pursuant to 15 U.S.C. § 22, the antitrust venue statute, which provides that any antitrust suit against a corporation may be brought in any judicial district in which the defendant is an inhabitant, is found, or transacts business. Defendants Google LLC and Alphabet Inc. transact substantial business in the District of Hawaii, including: (a) selling search advertising

11

through Google Ads to Hawaii-based businesses and individuals; (b) providing general search engine services to Hawaii residents, businesses, and governmental entities; (c) deploying the Google Chrome browser to Hawaii users; (d) operating YouTube services for Hawaii users and advertising clients; (e) deploying AI Overviews to Hawaii-based users in response to their Google Search queries; (f) crawling and indexing content from Hawaii-based websites — including [Plaintiff's Internet Domain(s), to be identified in discovery] — by Google's Googlebot and related crawlers; (g) serving AI Overview responses to Hawaii users that are grounded by content crawled from Hawaii-based websites; and (h) providing Google AdSense advertising monetization services to Hawaii-based website publishers, including Plaintiff. Each of these activities constitutes the transaction of business in this District within the meaning of 15 U.S.C. § 22.

23. Venue is independently proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Specifically: (a) Google's Googlebot crawled, accessed, and copied content from [Plaintiff's Internet Domain(s), to be identified in discovery], a Hawaii-based website operated by a Hawaii-resident plaintiff, constituting a substantial event giving rise to Claims I through VII; (b) Google displayed AI Overviews to Hawaii-based users searching for civil law information, diverting traffic that would otherwise have been directed to [Plaintiff's Internet Domain(s), to be identified in discovery] and causing Plaintiff to lose advertising revenue in this District; (c) Plaintiff experienced the economic injury at the center of this lawsuit — lost search referral traffic, lost advertising impressions, lost advertising revenue, and lost user acquisition — while residing and operating his business in Aiea, Hawaii, in this District; and (d) the conduct at issue — Google's unlawful reciprocal dealing, content misappropriation, and monopoly maintenance — has its direct and ongoing injurious effects in this District, where Plaintiff operates Plaintiff's Online Publishing Business and resides.

24. Defendants are subject to personal jurisdiction in this District because they have purposefully directed their business activities toward the State of Hawaii, have transacted substantial and ongoing business within the State of Hawaii, and have purposefully directed the specific tortious and anticompetitive conduct at issue in this Complaint toward Plaintiff — a Hawaii resident operating a Hawaii-based internet publishing enterprise. Specifically: (a) Defendants have

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

knowingly crawled and indexed content from [Plaintiff's Internet Domain(s), to be identified in discovery], a Hawaii-based website, and incorporated that content into AI training datasets and RAG retrieval processes; (b) Defendants have displayed AI Overviews to Hawaii users that incorporate or are grounded by content derived from [Plaintiff's Internet Domain(s), to be identified in discovery]; (c) Defendants have sold advertising products to Hawaii businesses and provided search services to Hawaii residents continuously and systematically; and (d) Defendants' conduct has caused tortious economic injury to Plaintiff in this District. This action is filed pursuant to D. Haw. Local Rule LR3.1. Plaintiff avers that this Court may properly exercise personal jurisdiction over both Defendants consistent with the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

## IV. FACTUAL BACKGROUND

### A. Plaintiff's Online Publishing Business and Internet Publishing Enterprise

25. Plaintiff Theodore Haugland founded and is the sole operator of Plaintiff's Online Publishing Business, an internet publishing enterprise accessible at [Plaintiff's Internet Domain(s), to be identified in discovery]. Plaintiff conceived and established this enterprise as an online civil legal information resource designed to provide accurate, structured, and accessible information to ordinary Americans — individuals, self-represented litigants, and small business owners — who need to understand their civil legal rights, options, and obligations but cannot readily access or afford traditional legal counsel. The enterprise is not a law firm and does not provide legal advice; rather, it publishes original legal information content to educate the public about civil law topics in plain language informed by careful legal research.

26. Over the course of multiple years, Plaintiff has personally authored and overseen the creation of a proprietary library of original civil legal information content. This library includes, without limitation: original question-and-answer resources addressing common civil litigation questions in plain language; step-by-step procedural guides explaining how to file and serve civil complaints, respond to lawsuits, conduct civil discovery, prepare for trial, and pursue or defend post-judgment enforcement; statute analyses explaining the text, scope, and practical application of state and federal civil statutes; case law summaries distilling the holdings and practical implications of

13

significant civil court decisions for layperson audiences; and practice-area overview guides covering the essential legal framework, key rights, common claims, and available remedies across Plaintiff's subject-matter areas. Each content item represents an original intellectual work product authored or commissioned by Plaintiff, reflecting substantial investment of Plaintiff's time, legal knowledge, and editorial judgment.

27. Plaintiff's content covers the following civil law topic areas, among others: (a) **Civil Procedure** — the rules and processes governing how civil lawsuits are filed, served, litigated, and appealed in state and federal courts, including complaints, summonses, motions, discovery, summary judgment, trial, and appellate procedures; (b) **Tort Law** — the principles governing civil liability for negligence, premises liability, products liability, intentional torts, fraud, defamation, and personal injury, including damages and defenses; (c) **Contract Law** — the formation, validity, interpretation, breach, and remedies for contracts, including specific performance, rescission, and damages; (d) **Property Law** — the rules governing real and personal property ownership, transfers, easements, adverse possession, boundary disputes, and landlord-tenant relationships; (e) **Consumer Protection Law** — federal and state consumer protection statutes, unfair and deceptive trade practices, debt collection abuses, warranty claims, and consumer remedies; (f) **Civil Rights** — Section 1983 civil rights claims, constitutional rights of private individuals against governmental actors, discrimination claims, and available remedies; (g) **Landlord-Tenant Law** — eviction procedures, lease agreements, security deposit law, habitability standards, and tenant rights and remedies; and (h) **Small Claims Practice** — filing procedures, evidence standards, trial practice, judgment enforcement, and available remedies in small claims courts across United States jurisdictions.

28. The content published by Plaintiff's Online Publishing Business is distinguished from generic or low-quality web content by several characteristics that make it particularly valuable for users — and, as alleged herein, particularly valuable as AI training data and RAG grounding context for Google's AI systems. Specifically: Plaintiff's content is legally accurate — every article, guide, and Q&A resource is grounded in applicable statutes, court rules, and authoritative case law, minimizing the risk of providing users with incorrect legal information that could prejudice their

14

legal rights; Plaintiff's content is structured for comprehension — organized in Q&A format, numbered step-by-step procedures, definitional explainers, and practice-area overviews that segment complex legal information into accessible, logically sequenced units; Plaintiff's content is authoritative and verifiable — each content item cites or incorporates references to applicable primary legal authorities including statutes, court rules, and leading cases; and Plaintiff's content is targeted at high-frequency information needs — the questions Plaintiff's content answers are the same questions that millions of Americans search for in Google every year.

29. Plaintiff's Online Publishing Business historically relied heavily upon organic search referral traffic from Google Search as its primary source of user acquisition. When a user entered a civil law question into Google Search — for example, "how do I respond to a civil complaint," "what is the statute of limitations for negligence in Hawaii," "can I be evicted without a court order," or "what are the elements of breach of contract" — Google's search algorithm would identify Plaintiff's relevant content as among the most authoritative and responsive results and list it in the organic search results, directing users who clicked on the listing to [Plaintiff's Internet Domain(s), to be identified in discovery]. These user visits, aggregated across many thousands of search queries daily, constituted the foundational traffic on which Plaintiff's advertising revenue and business model depended. Google Search delivered a substantial majority of Plaintiff's organic web traffic throughout the period prior to the May 14, 2024 AI Overviews rollout.

30. Beginning with Google's May 14, 2024 nationwide rollout of AI Overviews, Plaintiff began experiencing a dramatic and accelerating decline in search referral traffic to [Plaintiff's Internet Domain(s), to be identified in discovery]. The AI Overviews feature surfaces a prominent, AI-generated answer block at the very top of Google's search results page — above all organic listings, above all paid advertisements, and above all other SERP features — in response to many of the same civil law queries for which users previously clicked through to Plaintiff's content. The AI-generated answers displayed in AI Overviews are synthesized from content like Plaintiff's, retrieved from Google's search index and used as RAG grounding context, or derived from training data that includes content previously crawled from publisher websites. As a result, users receive a direct, structured answer to their legal information query without clicking through to [Plaintiff's Internet

Domain(s), to be identified in discovery], eliminating the advertising impression that would otherwise have been recorded, reducing Plaintiff's advertising revenue, and depriving Plaintiff of the user engagement on which his business model depends.

31. The traffic decline Plaintiff has experienced since the May 14, 2024 AI Overviews rollout has been material, ongoing, and attributable to Google's AI Overviews feature. The causal mechanism is straightforward: Google's AI Overviews answer civil law queries at the top of the SERP, displacing the organic results where Plaintiff's content would otherwise appear, reducing the user's incentive to click through to Plaintiff's website, and capturing for Google the informational value — and advertising revenue — that would otherwise accrue to Plaintiff. Specific traffic decline percentages, advertising revenue loss figures, and web analytics data will be disclosed and established through expert analysis and discovery. Plaintiff avers that the facts supporting causation are fully consistent with and corroborated by the industry-wide data published by SimilarWeb (zero-click share rising from 56% to 69% between May 2024 and May 2025), Gartner Research (search volume declining 25% by 2026), and the Raptive publisher impact study (publisher traffic declining 20%–60% following the AI Overviews rollout).

32. Plaintiff has received zero compensation from Google for any of the following uses of his content: (a) the crawling and indexing of [Plaintiff's Internet Domain(s), to be identified in discovery] by Googlebot; (b) the inclusion of Plaintiff's content in training datasets used to train the large language models underlying Gemini and AI Overviews; (c) the real-time retrieval of Plaintiff's content as grounding context for AI Overview responses displayed on Google's SERP; (d) the display of excerpts or synthesized versions of Plaintiff's content in Featured Snippets, People Also Ask panels, or AI Overviews; and (e) the generation of advertising revenues by Google from AI Overview impressions served in response to civil law queries answered using content derived from Plaintiff's website. Each of these uses confers substantial economic value on Google at Plaintiff's direct expense.

33. Plaintiff, as a small independent legal information publisher operating from Aiea, Hawaii, has no market power to negotiate with Google. Plaintiff cannot credibly threaten to withhold his content from Google's search index, because doing so would destroy the traffic — and therefore the

16

revenue — that sustains Plaintiff's Online Publishing Business. Plaintiff's negotiating position vis-à-vis Google is defined entirely by this asymmetry: Google can replace any single publisher's content with content from hundreds of other publishers, while Plaintiff cannot replace Google's search traffic with any commercially comparable alternative. This asymmetry is the product of Google's adjudicated monopoly and is itself both a symptom and a cause of the antitrust injury alleged herein.

34. Plaintiff avers that the specific domains, content URLs, content volume metrics, web analytics data (including historical traffic data before and after the May 14, 2024 AI Overviews rollout), advertising revenue history, and all related financial and operational data of Plaintiff's Online Publishing Business will be produced to Defendants through discovery under appropriate protective order, and will be the subject of expert economic analysis quantifying Plaintiff's damages. Plaintiff reserves the right to supplement the specific factual allegations of this Complaint as additional information becomes available through discovery, including through forensic analysis of Google's crawl records, training dataset records, and AI Overview generation logs related to [Plaintiff's Internet Domain(s), to be identified in discovery].

### B. The Traditional Search Bargain and Its Systematic Destruction

35. Since the early commercial internet, the relationship between general search engines and online content publishers rested on a foundational and mutually beneficial economic bargain that has been recognized and relied upon by courts, economists, and industry participants alike. The terms of this bargain were straightforward: publishers allow search engines to crawl and index their content; in exchange, search engines direct users to publisher websites through organic search result listings. This arrangement — the "access for traffic" exchange — simultaneously served users (who found relevant content), publishers (who acquired users), and search engines (who provided a valuable information-organization service and monetized the traffic through search advertising). Every participant in the early search ecosystem understood and relied upon this bargain as the foundational economic premise of the commercial web.

36. The access-for-traffic exchange sustained the entire ecosystem of ad-supported online publishing for over two decades. Under this model, publishers invest resources in creating original, accurate, and well-organized content; users search for information using a general search engine; the

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

search engine returns a ranked list of relevant website links; users click on the most relevant link and visit the publisher's website; publishers monetize those website visits through display advertising, subscription conversions, lead generation, and affiliate commerce; the monetization revenues sustain the publishers' ongoing investment in content creation; new content attracts new users; and the cycle perpetuates itself. At each step in this cycle, the organic referral click — the user's decision to click on a search result link and visit a publisher's website — was the essential unit of value exchange: publishers received traffic; search engines received the right to index content. The click was the currency.

37. Google historically positioned itself as the steward of this bargain. Google's publicly stated mission — "to organize the world's information and make it universally accessible and useful" — was operationalized through a search engine that listed the most relevant existing publisher websites in response to user queries, directing users to the original source rather than becoming the source itself. Google's PageRank algorithm was explicitly designed to rank publisher websites by the quality and authority of their original content, rewarding investment in quality content production with higher search visibility and greater traffic. Under this original model, higher content quality produced more search referral traffic, which produced more advertising revenue, which funded more content quality — a virtuous cycle that incentivized publisher investment in original content and benefited the entire information ecosystem.

38. Google began systematically eroding the access-for-traffic bargain beginning in the early 2010s, through a series of SERP feature introductions that progressively answered user queries directly on Google's search results page rather than directing users to publisher websites. The erosion proceeded through the following stages: (a) **Google News (2002)** — aggregated news article links in a dedicated Google-hosted environment, reducing user exposure to publisher brand identities and generating advertising revenue for Google rather than publishers; (b) **Knowledge Panel (2012)** — a prominent right-side informational panel answering factual queries directly on the SERP from a Google-curated database, eliminating click-throughs for factual information queries; (c) **Featured Snippets (2014)** — extraction and display of text excerpts from publisher websites directly at the top of the SERP, often answering user queries completely, eliminating the need to click through to

the source; (d) **People Also Ask panels (2015)** — expandable Q&A boxes derived from publisher content, further answering user queries on the SERP without requiring clicks to publisher websites. Each of these features reduced publisher traffic while increasing user time-on-Google-SERP and Google's advertising inventory.

39. The cumulative effect of these SERP feature introductions was a steady and measurable decline in the percentage of Google searches resulting in a click-through to an external website. By 2019, industry analysis indicated that fewer than 50% of all Google searches resulted in any click to an external website — the majority of searches were "zero-click searches," meaning users obtained sufficient information directly from the Google SERP without visiting any publisher website. This represented a fundamental alteration of the access-for-traffic bargain: Google was now retaining more than half the value generated by publisher content in indexed results, returning nothing to publishers for the proportion of queries it answered directly.

40. By 2024, the zero-click share had grown to nearly 60% of all Google searches, according to industry data. The structural shift toward zero-click behavior was driven by Google's progressive expansion of SERP features, each of which incrementally reduced the need for users to leave Google to satisfy their information needs. The economic consequence for publishers was correspondingly progressive: as the zero-click share grew, publishers received proportionally less traffic per unit of indexed content, reducing the return on their investment in content creation and undermining the economic foundation of ad-supported online publishing.

41. The May 14, 2024 nationwide rollout of Google's AI Overviews feature dramatically and discontinuously accelerated this trend. AI Overviews is not a marginal increment to Google's existing SERP features; it is a qualitative rupture. Unlike Featured Snippets, which displayed an excerpt from a specific publisher's page (at least creating some user awareness of the source), AI Overviews generates an entirely new, synthesized, AI-composed response directly on the SERP — a response that does not identify any specific source, does not credit any specific publisher, does not direct users to any specific website, and is presented as Google's own answer to the query. The AI-generated answer is displayed in a prominent, visually distinct panel at the very top of the search

results page, above all other content, consuming the most valuable above-the-fold screen real estate and frequently resolving the user's information need without scrolling to the organic results below.

42. Following the May 14, 2024 AI Overviews rollout, zero-click searches rose from approximately 56% to approximately 69% of all Google queries — an increase of 13 percentage points in twelve months, representing a structural shift in search behavior at scale. According to SimilarWeb's May 2025 Zero-Click Search Trends Report, this acceleration in zero-click behavior is directly attributable to AI Overviews, which answers complex, multi-part informational queries that previously required users to click through to multiple publisher websites to find comprehensive answers. The categories most heavily impacted by AI Overviews zero-click acceleration include informational queries — precisely the category in which Plaintiff's civil legal information content competes.

43. As of mid-2025, 37 of the top 50 United States news and information domains have experienced year-over-year organic search traffic declines since the AI Overviews rollout — a breadth of impact across the online publishing industry that confirms the systemic, market-wide character of the harm Plaintiff alleges, and that distinguishes this harm from idiosyncratic competitive displacement that might be attributable to the ordinary operation of market competition. The harm is not the result of superior competing content; it is the result of Google's AI-generated content displacing all competing publisher content at the top of the SERP using, without permission or compensation, the very content created by the publishers it is displacing.

44. Civil law queries — asking for factual, procedural, and definitional legal information — are among the categories most heavily answered by AI Overviews. This is precisely because civil law questions tend to have structured, verifiable answers that AI systems can synthesize reliably from authoritative sources: "What is the statute of limitations for negligence?" has a state-specific numerical answer. "What must a complaint contain?" has a procedural list drawn from applicable rules. "What are the elements of unjust enrichment?" has a well-established doctrinal formulation. These are exactly the types of structured, factual, authoritative answers that AI Overviews is designed to provide, and exactly the types of content that Plaintiff has invested years in producing. Google's AI Overviews appropriates this structured content from publishers like Plaintiff to generate

authoritative-appearing AI answers that eliminate the users' need to click through to the original sources.

45. The harm to Plaintiff from the destruction of the access-for-traffic bargain is not merely economic in isolation — it has systemic consequences for the competitive health of the Online Legal Information Publishing market. When publishers cannot monetize their content through search referral traffic, they cannot sustain the investment required to produce accurate, authoritative, and updated legal information. As independent publishers like Plaintiff are squeezed out of the market by Google's AI Overviews, the quality and diversity of available civil legal information declines, self-represented litigants have fewer accurate resources to rely on, and Google — which faces no obligation to maintain accuracy standards comparable to those Plaintiff and his counterparts apply — increasingly becomes the sole, unaccountable arbiter of what civil legal information the public receives. This outcome harms not only Plaintiff but the public interest in access to accurate legal information.

46. That Google is fully aware of the harm its AI Overviews cause to publisher traffic is demonstrated by internal acknowledgment at the highest levels of Google's AI research organization. Marc Najork, a Distinguished Research Scientist at Google DeepMind and one of Google's most senior AI researchers, acknowledged in a July 2023 presentation that "direct answers reduce search referral traffic" and that AI-generated direct answers "reduce referrals to content providers hurting their ability to monetize." This is not an inference or external criticism — it is Google's own senior researcher acknowledging, in the year before the AI Overviews nationwide rollout, that the technology Google was about to deploy at scale would reduce publisher referral traffic and damage publishers' economic viability. Google deployed AI Overviews anyway, without establishing any mechanism for compensating publishers for the traffic and monetization losses its own researchers predicted.

**C. Google's Adjudicated Monopoly Power in General Search Services**

47. On August 5, 2024, the Honorable Amit P. Mehta, United States District Judge for the District of Columbia, issued findings of fact and conclusions of law in **United States v. Google LLC**, No. 1:20-cv-03010-APM, 2024 WL 3647498 (D.D.C. Aug. 5, 2024), adjudicating that Google

21

LLC holds monopoly power in the relevant market for General Search Services in the United States, and that Google willfully acquired and maintained this monopoly through exclusionary conduct in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Judge Mehta's ruling constitutes a binding judicial adjudication of Google's monopoly status and the unlawful means by which it was maintained. Because the monopoly determination has been adjudicated by a court of competent jurisdiction in a case initiated by the United States Department of Justice, Plaintiff need not independently establish that threshold element in this action and incorporates Judge Mehta's findings by reference as established facts.

48. The DOJ Monopoly Decision found that Google holds approximately **89.2% of all general search query volume in the United States**, rising to **94.9% on mobile devices**. These figures represent a degree of market concentration that is unprecedented in the history of any major United States communications technology market. By comparison, at the time the United States Supreme Court decided United States v. Grinnell Corp., 384 U.S. 563 (1966) — the foundational Section 2 monopolization case — the defendant held approximately 87% of its relevant market, which the Court unanimously held sufficient to constitute monopoly power. Google's 89.2% (and 94.9% mobile) market share substantially exceeds even that historically high benchmark.

49. Judge Mehta found that Google maintained its search monopoly in part through a systematic program of exclusive dealing contracts with device manufacturers, browser developers, and wireless carriers — paying those companies to set Google as the default search engine on their devices and platforms. These exclusionary payments totaled approximately **$26.3 billion in the year 2021 alone**, representing Google's largest single category of operating expense. The recipients of these payments included Apple Inc. (the default search agreement on all Apple devices and the Safari browser, representing an estimated $18–20 billion of the 2021 total), Mozilla Foundation (the Firefox browser default), Samsung Electronics (default search on Samsung Android devices), AT&T Inc., and other device manufacturers and wireless carriers. Judge Mehta found these exclusive default-placement agreements constituted unlawful exclusive dealing under Section 2 of the Sherman Antitrust Act because they substantially foreclosed rivals from accessing the distribution channels necessary to achieve competitive scale.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

50. The scale-based feedback loop that sustains and entrenches Google's search monopoly is itself a barrier to competition that Judge Mehta expressly recognized. General search quality — the relevance and accuracy of search results — improves as a direct function of the volume of user queries processed. Greater query volume generates more behavioral data (click-through rates, dwell time, bounce rates, and related signals) that can be used to train and refine search ranking algorithms. Because Google processes approximately 89.2% of all U.S. search queries, it generates search quality training data at a volume that no rival can replicate. Bing, with 3–5% of query volume, generates roughly one-twenty-fifth of the behavioral training signal that Google accumulates daily, making it structurally impossible for Bing to achieve search quality parity with Google regardless of the engineering resources invested. This self-reinforcing scale advantage is a critical component of Google's durable monopoly and has been incorporated into Google's AI systems, as the transformer models underlying Gemini and AI Overviews are trained in part on Google's uniquely vast dataset of user search behavior.

51. Judge Mehta also found that Google charges supracompetitive prices for search text advertising — the keyword auction system through which businesses pay Google to display ads alongside organic search results. This finding has a direct and significant impact on publishers: publishers who wish to supplement the organic search traffic they have lost to AI Overviews by purchasing paid Google search advertising must pay Google's supracompetitive monopoly prices to do so. In other words, Google's AI Overviews divert organic traffic from publishers and into Google's SERP, and when those publishers attempt to recapture some of that lost traffic by paying for Google Ads, they must pay monopoly-inflated prices. Publishers are simultaneously harmed on the traffic side (by AI Overviews) and on the remediation side (by supracompetitive advertising prices), a double injury that flows directly from Google's monopoly power.

52. The DOJ Monopoly Decision established that the relevant market for General Search Services does not include social media platforms (such as Facebook, Instagram, or TikTok), special-purpose vertical search engines (such as Amazon for product searches or Yelp for local business searches), or AI chat interfaces (such as ChatGPT or Perplexity AI) as reasonably interchangeable substitutes for general search. Judge Mehta found that users turn to general search engines for a

qualitatively distinct type of query — open-ended, exploratory information searches — that no other product or service category satisfies. This market definition confirms that there is no alternative distribution channel to which publishers like Plaintiff can turn to replace Google Search referral traffic if Google's conduct reduces or eliminates that traffic.

53. On September 2, 2025, the District Court for the District of Columbia, sitting as a remedies court in the DOJ Monopoly Decision proceeding, entered a remedies order addressing Google's unlawful monopoly maintenance. The remedies order, inter alia: (a) barred Google from entering into or maintaining exclusive distribution contracts for Google Search, Chrome, Google Assistant, and the Gemini AI application; (b) required Google to make its search index and user-interaction data available to competitor search engines on non-discriminatory terms; (c) extended the remedies explicitly to generative AI technologies and products, recognizing that Google's AI Overviews deployment is intertwined with and extends Google's search monopoly; and (d) required ongoing monitoring of Google's compliance. The remedies order confirms the judicial recognition that Google's AI Overviews deployment is part of the monopoly conduct that requires structural remedy, directly corroborating the antitrust theory advanced in this Complaint.

54. In April 2025, the United States District Court for the Eastern District of Virginia issued a liability finding in **United States v. Google LLC (Ad Tech)**, No. 1:23-cv-00108-LKG (E.D. Va. Apr. 17, 2025), adjudicating that Google illegally monopolized the markets for publisher ad servers and open web display advertising exchanges (the "ad tech monopoly"). The ad tech monopoly finding has independent significance for Plaintiff: it demonstrates that Google's conduct in this Complaint is not an isolated deviation from competitive behavior but reflects a systematic corporate strategy of monopolization across multiple adjacent markets in the internet advertising and information ecosystem — a pattern that courts have now found unlawful in two separate proceedings brought by the United States Department of Justice. Google's unlawful conduct in the Search Referral Traffic market is consistent with, and should be evaluated against the background of, this documented corporate pattern of anticompetitive monopolization.

55. Microsoft's Bing holds approximately 3–5% of the U.S. general search market. All other general search alternatives — DuckDuckGo, Yahoo Search (powered by Bing), Ecosia, Brave

Search, and others — collectively account for less than 5% of additional U.S. search query volume. The combined non-Google share of U.S. general search is thus no greater than approximately 10–11%, and the vast majority of that non-Google volume runs on Bing's infrastructure. No commercially viable alternative to Google Search exists for publishers seeking to acquire users through organic search referral traffic in the United States at scale. A content publisher that maintained equivalent organic search visibility in Bing as in Google would receive, at best, approximately one-tenth the organic search referral traffic volume for the same content — an insufficient replacement for the traffic lost when Google's AI Overviews displace that content from the top of Google's SERP.

56. Google's monopoly power in General Search Services is not merely a matter of current market share; it is structurally entrenched and self-sustaining through the scale-based feedback loop described above, through exclusive default-placement agreements (the primary form of which have been found unlawful but many of which remain operative pending appeal), and through the network effects of user familiarity and habit. Rivals cannot replicate Google's search quality without first having Google's query volume, and they cannot obtain Google's query volume because Google's default placement agreements preempt the distribution channels through which rivals would need to reach users. This structural entrenchment is precisely what renders the harm to publishers like Plaintiff irreversible in the absence of judicial intervention: there is no competitive market process that will, on its own and in any reasonable timeframe, discipline Google's coercive content extraction practices.

57. Google's AI Overviews deployment directly leverages and extends its adjudicated General Search monopoly. The same structural advantages that make Google's search monopoly durable — scale-based training data advantage, default placement on billions of devices, entrenched user habit — also make Google's AI Overviews dominant. Google deploys AI Overviews within the same search interface that users access through entrenched default placements and habit, giving AI Overviews automatic distribution to approximately 89.2% of all U.S. search queries. By December 2024, AI Overviews was reported to be serving over one billion users globally. No AI chat rival —

not OpenAI's ChatGPT, not Perplexity AI, not Microsoft's Copilot — has comparable distribution scale, because none has Google's search monopoly as a distribution vehicle.

58. The foregoing establishes that Google's monopoly power in General Search Services is the essential enabling condition for the anticompetitive conduct alleged in this Complaint. Without monopoly power over Search Referral Traffic — the irreplaceable distribution channel on which publisher survival depends — Google could not coerce publishers into providing free content for republishing, AI training, and RAG use. Publishers could refuse Google's terms and distribute their content through competitive alternatives. But because no alternative exists, publishers cannot credibly refuse, and Google's coercion succeeds. The monopoly is the mechanism of the antitrust violation, not merely background context.

### D. Google's Generative AI Expansion and the Deployment of AI Overviews

59. Google's development of generative AI capabilities — and its exploitation of publisher content to build those capabilities — did not occur suddenly or accidentally. It reflects a decade-long strategic investment trajectory documented in the trial record of the DOJ Monopoly Decision and in publicly available corporate filings and announcements. Understanding this trajectory is essential to understanding the nature of the content misappropriation alleged herein: Google has been systematically expanding the range of uses for which it extracts value from publisher content, incrementally and deliberately, with full awareness of the economic harm those uses impose on publishers.

60. In **2011**, Google launched Google Brain, an internal deep learning research project that applied neural network architectures to large-scale machine learning tasks. Google Brain became one of the world's most influential AI research organizations and produced key researchers and technical architectures that underlie the generative AI systems at issue in this Complaint. Google Brain's early work established that training large neural networks on massive datasets of text from the internet — including content crawled by Googlebot from publisher websites — could produce qualitatively superior natural language understanding capabilities.

61. In **2014**, Google acquired DeepMind Technologies, a London-based artificial intelligence company, for a reported acquisition price exceeding $500 million. DeepMind's capabilities in

26

reinforcement learning, neural architecture research, and applied AI safety became central components of Google's long-term AI strategy. DeepMind was subsequently merged with Google Brain to form Google DeepMind in April 2023, creating the unified AI research organization responsible for, among other things, the Gemini family of large language models that underlie AI Overviews.

62. In **2017**, researchers at Google published "Attention Is All You Need," the landmark paper introducing the transformer neural network architecture. The transformer architecture — which uses a "self-attention" mechanism to process and relate tokens across long sequences of text — is the foundational technical breakthrough underlying every major large language model in current commercial deployment, including the models underlying Google's Gemini and AI Overviews, OpenAI's GPT series, and all other contemporary generative AI systems. Without the transformer architecture, modern large language models as they currently exist would not be computationally feasible. Google's publication of this architecture, while making the underlying technique available to the field, also established Google's position at the leading edge of large language model research and confirmed its intent to develop and deploy these systems commercially.

63. In **2018**, Google developed and deployed BERT (Bidirectional Encoder Representations from Transformers), a large transformer-based language model that Google integrated into its search ranking algorithm. BERT was described in the trial record of the DOJ Monopoly Decision as "transformational" in its impact on Google's search quality. BERT was trained on a massive corpus of text data, including content crawled from the internet by Googlebot, and significantly improved Google's ability to understand the semantic intent of user queries — enabling Google to match queries to relevant publisher content with substantially greater accuracy. BERT's integration into Google Search further deepened the dependence of Google's core search product on publisher-created web content as a training data resource.

64. By **2021**, Google developed and deployed T5 (Text-to-Text Transfer Transformer) and the Multitask Unified Model (MUM), the latter of which Google CEO Sundar Pichai publicly described as "1,000 times more powerful than BERT." MUM and T5 achieved what Google scientists characterized as essentially human-level performance on a range of natural language understanding

27

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

and generation tasks, including the ability to synthesize answers to complex, multi-part informational queries from multiple source documents — precisely the capability deployed in AI Overviews to synthesize civil law answers from publisher content like Plaintiff's.

65. In **November 2022**, OpenAI publicly launched ChatGPT, a consumer-facing AI chat interface powered by the GPT-3.5 large language model. ChatGPT achieved mass consumer adoption with unprecedented speed, attracting approximately one million users within five days of launch and 100 million users within two months. ChatGPT's launch triggered what internal Google communications described as a "code red" — an internal emergency declaration reflecting Google's executive leadership's recognition that conversational AI chat represented a potential competitive threat to Google's search monopoly. This code red precipitated an acceleration of Google's internal AI development and commercialization timeline and a strategic decision to integrate generative AI directly into Google Search rather than allowing AI chat interfaces to compete with Google Search as an alternative information-retrieval product.

66. In **February 2023**, Google launched Bard, a consumer-facing generative AI chat interface initially powered by Google's LaMDA (Language Model for Dialogue Applications) large language model, subsequently upgraded to the PaLM 2 model, which Google trained on a dataset of approximately 3.6 trillion tokens of text — a dataset that included substantial quantities of publisher-created web content crawled by Googlebot. Bard was Google's direct competitive response to ChatGPT, designed to demonstrate that Google possessed equivalent or superior generative AI capabilities and to preempt the migration of Google's search user base to AI chat competitors.

67. In **May 2023**, at Google's annual Google I/O developer conference, Google announced the Search Generative Experience (SGE) — a prototype integration of generative AI summarization directly into Google Search results. SGE was presented as an experimental preview of AI Overviews, allowing users invited to Google Search Labs to receive AI-generated summary answers at the top of their search results pages for qualifying queries. SGE demonstrated, for the first time at commercial scale, the operational mechanism challenged in this Complaint: generative AI answers synthesized from publisher content, displayed above organic results, eliminating the need for users to click through to publisher websites.

28

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

68. On **July 1, 2023**, Google LLC updated its Privacy Policy to explicitly confirm that Google uses publicly available web content — content crawled by Googlebot from publisher websites — to train its AI models, including Bard (subsequently Gemini) and the AI Overviews system. A Google spokesperson confirmed at the time that the update "simply clarifies that newer services like Bard are also included" in Google's practice of using web-scraped content for AI model training. This Privacy Policy update constitutes Google's own written confirmation, effective before the AI Overviews nationwide rollout, that Google was using publisher content — including content from [Plaintiff's Internet Domain(s), to be identified in discovery] — for AI training purposes without obtaining publisher consent, a license, or compensation. This written confirmation is directly relevant to Plaintiff's unjust enrichment claim under Count VII and establishes Google's knowledge of its use of publisher content for AI training purposes.

69. Also in **July 2023**, Marc Najork, a Distinguished Research Scientist at Google DeepMind and one of Google's most senior AI researchers, presented findings acknowledging that AI-generated direct answers "reduce search referral traffic" and "reduce referrals to content providers hurting their ability to monetize." This acknowledgment — made by Google's own AI researcher one year before the nationwide AI Overviews rollout — confirms that Google's most senior technical personnel understood, as a predicted and expected consequence of deploying AI Overviews at scale, that the technology would reduce publisher referral traffic and damage publisher monetization. Google deployed AI Overviews nationwide in May 2024 without establishing any compensation mechanism for publishers whose traffic and monetization would predictably be harmed, as its own researchers had acknowledged.

70. In **December 2023**, Google announced Gemini as its "most capable and general model yet" — a multimodal large language model trained on a dataset that Google described as exceeding the scale of any previously disclosed training corpus. Gemini replaced PaLM 2 as the primary model powering Bard (which was simultaneously rebranded as Gemini) and was integrated into Google Search to power the AI Overviews system. The scale of Gemini's training corpus — the specific contents of which Google has not publicly disclosed in detail — is directly relevant to the allegations in this Complaint, as it almost certainly includes substantial quantities of content crawled from

29

publisher websites, including civil legal information content of the type published by Plaintiff's Online Publishing Business.

71. On **May 14, 2024**, Google rolled out AI Overviews to the full United States user base — hundreds of millions of users — replacing the experimental Search Generative Experience preview with a permanent, default feature of Google Search. AI Overviews appeared, without user opt-in, at the top of Google Search results pages for a wide range of informational queries, including the civil law information queries for which Plaintiff's content was previously listed in organic results. The nationwide rollout on May 14, 2024 is the precipitating event of the ongoing antitrust injury alleged in this Complaint: it is the date on which Google's coercive extraction of publisher content for unauthorized secondary uses became fully operative at commercial scale, causing the measurable, ongoing harm to Plaintiff described herein.

72. On **August 15, 2024**, Google extended AI Overviews to signed-out users — users who had not logged into any Google account — in the United States, expanding the reach of AI Overviews to the maximum possible U.S. user base, including casual users who do not maintain Google accounts. By year-end 2024, Google reported that AI Overviews was serving over one billion users globally. In December 2024, Google released Gemini 2.0, a significantly upgraded generative AI model incorporating enhanced multimodal capabilities and expanded context windows, and integrated Gemini 2.0 into the AI Overviews system. Alphabet's Fiscal Year 2024 Annual Report disclosed capital expenditures exceeding $52 billion for AI infrastructure — the largest annual AI infrastructure investment in corporate history at the time — confirming the extraordinary financial commitment Defendants have made to the AI systems that harm Plaintiff.

73. AI Overviews operates through two distinct technical mechanisms, each of which extracts value from publisher content without consent, license, or compensation. The first mechanism is **large language model training** (LLM training): Google's Googlebot crawls publisher websites and accumulates a corpus of textual content; that corpus is used as training data during the pre-training phase of large language model development; the model learns from this text the statistical patterns of language, the associations between concepts, the factual content encoded in the text, and the stylistic and structural conventions of well-organized informational writing; and the trained model

30

incorporates this learned knowledge into its parameters, where it becomes part of the model's permanent capability to generate responsive answers. LLM training is a one-time, large-scale ingestion of publisher content that produces model parameters encoding the knowledge and patterns contained in that content. The second mechanism is **retrieval-augmented generation** (RAG): at query time, when a user submits a search query that qualifies for an AI Overview response, Google's system retrieves current, relevant publisher content from its search index — including content from [Plaintiff's Internet Domain(s), to be identified in discovery] — and provides that retrieved content to the language model as real-time grounding context, a "prompt" against which the model generates its AI Overview response. RAG enables the AI Overview to produce accurate, up-to-date, and topically specific answers by incorporating current publisher content into each individual response generation. Both LLM training and RAG use publisher content without publisher consent or compensation, and both are challenged in this Complaint as elements of Google's unlawful reciprocal dealing and content misappropriation.

### E. The Illusory "Opt-Out" — The Hobson's Choice Imposed on Publishers

74. Google has made available, at various times, certain tools and protocols that purport to allow publishers to opt out of specific Google uses of their content. Google has publicly represented these tools as evidence that publishers have meaningful choice in how their content is used. This representation is false. Each available opt-out mechanism either fails to prevent the specific harmful use, imposes punishing collateral costs on the publisher's search visibility that make the opt-out commercially impractical, or fails to address uses of publisher content that have already occurred. The cumulative effect is that no commercially viable opt-out path exists for publishers who depend on Google Search for user acquisition — a description that encompasses all publishers operating in the online publishing markets at any meaningful commercial scale.

75. The first available opt-out mechanism is the **"nosnippets" meta tag**, which Google introduced in 2019. The nosnippets tag, when inserted in a publisher's HTML, instructs Google not to display any text excerpt or snippet from the tagged page in Google Search results — including Featured Snippets and Google's display of excerpt text below organic listing titles. While the nosnippets tag prevents Featured Snippet display of the publisher's content, it imposes significant

31

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

collateral costs: (a) it removes all rich result features from the publisher's search listings, including structured data-based enhancements that improve click-through rates; (b) it prevents Google from displaying any descriptive text excerpt below the publisher's listing title in organic results, reducing the informativeness and click-appeal of the listing; and (c) critically, it does not prevent Google from using the page's content for LLM training or RAG grounding purposes — the nosnippets tag addresses only the Featured Snippet display mechanism, not the AI training and RAG use mechanisms that are the primary subject of this Complaint. A publisher that implements nosnippets tags across all pages accepts substantially degraded search visibility in exchange for protection against Featured Snippets only, while receiving no protection against the AI training and RAG uses that cause the greater and more systematic harm.

76. The second available opt-out mechanism is the **Google-Extended crawler exclusion token**, which Google introduced in September 2023. The Google-Extended token, when inserted into a publisher's robots.txt file, purports to exclude the publisher's content from being used to train Google's Gemini models and the Vertex AI platform. However, the Google-Extended exclusion is critically limited in multiple respects: (a) it does not prevent AI Overviews from using the excluded content in real-time RAG retrieval operations — Google explicitly confirmed that content excluded via Google-Extended may still be used by AI Overviews as grounding context for response generation; (b) it does not retroactively remove a publisher's content from training datasets in which that content was already incorporated during prior training sweeps that occurred before the publisher implemented the exclusion — content already incorporated into trained model parameters cannot be "unlearned" without complete model retraining; (c) it was introduced approximately two years after Google began the primary training data collection for the models that underlie AI Overviews, meaning that most publisher content had already been incorporated into training datasets by the time publishers were given any means to opt out; and (d) it remains dependent on Google's voluntary cooperation, as there is no technical enforcement mechanism preventing Google from modifying or discontinuing its commitment to honor the exclusion token.

77. The third available mechanism — blocking Googlebot entirely through the robots.txt Disallow directive — is the only technical means by which a publisher can comprehensively prevent

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Google from crawling, indexing, and using their content for any purpose. However, blocking Googlebot removes the publisher from Google's entire search index, eliminating all organic search result listings for that publisher's website. Because Google controls approximately 89.2% of U.S. search queries (94.9% on mobile), a publisher excluded from Google's index loses access to the organic search referral traffic that represents the overwhelming majority of intent-driven user acquisition for online publishers. For any publisher that relies on organic search traffic for a meaningful portion of its revenues — a description that encompasses Plaintiff and the overwhelming majority of content publishers in the online publishing markets — blocking Googlebot is commercially suicidal. It is the equivalent of a newspaper being forced to choose between allowing its distribution van to be used for the distributor's unauthorized purposes and having the van refuse to deliver the newspaper to subscribers. The "opt-out" destroys the publisher's business.

78. Publishers have also attempted to use publisher-created exclusion signals such as "noai" and "noimageai" meta tags — tags that instruct AI companies not to use the tagged pages' content for AI training or generation purposes. Google has explicitly declined to commit to honoring these publisher-created signals, stating that there is no binding industry standard that Google has committed to respect and that Google's honor of any given meta tag is discretionary. This is further evidence that the opt-out mechanisms available to publishers are entirely at Google's discretion and unilateral control — they exist insofar as Google chooses to honor them and can be modified or discontinued unilaterally by Google at any time without notice or liability.

79. The coercive structure created by these illusory opt-out mechanisms is the essence of the Hobson's Choice that Plaintiff alleges: publishers may either (a) allow Google to crawl their content and accept all of Google's unauthorized secondary uses — republishing in SERP features, LLM training, RAG grounding — without consent or compensation, or (b) implement targeted opt-outs that impose punishing costs on search visibility while providing incomplete protection against the harms they are intended to address, or (c) block Googlebot entirely and accept the destruction of their businesses. There is no option (d): no mechanism exists by which a publisher can obtain organic search listing placement from Google while preventing Google from using that publisher's content for republishing, AI training, and RAG grounding purposes. The "price" Google charges for search

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

listing placement — and has unilaterally expanded the definition of that "price" to include — is free content for all secondary uses, with no negotiation and no alternative.

80. Plaintiff, as a sole proprietor operating Plaintiff's Online Publishing Business from Aiea, Hawaii, with no legal or technical resources to negotiate with Google individually and no market power to enforce alternative arrangements, is subject to this Hobson's Choice in its most acute form. Plaintiff cannot credibly threaten to withhold his content from Google's index; doing so would destroy Plaintiff's Online Publishing Business. Plaintiff cannot negotiate a compensation agreement with Google; Google does not negotiate with individual small publishers. Plaintiff's only commercially viable option is to continue allowing Google to crawl and use his content across all secondary purposes, receiving no compensation, while watching his organic search traffic decline as AI Overviews displaces his content from the top of the SERP.

81. The coercive character of Google's conduct is most clearly demonstrated by the contrast with competitive behavior in functioning markets. In markets where firms do not possess monopoly power, content owners negotiate licensing agreements that specify permitted uses and compensation rates. OpenAI, Perplexity AI, and other AI companies that do not control a monopoly search distribution channel have entered content licensing agreements with major media and publishing companies (identities to be established through discovery), paying market rates for the right to use publisher content for AI training and retrieval. These agreements demonstrate that a market rate for AI-use licenses exists and is commercially recognized. Google, uniquely, has declined to negotiate or enter such agreements, relying instead on its monopoly power over Search Referral Traffic to extract the same value for free. Google's refusal to license — available only to a firm with Google's market power — is the defining evidence that the access-for-training arrangement is not a voluntary market exchange but a coercive monopoly extraction.

82. The European Commission received a formal complaint from the Independent Publishers Alliance on June 30, 2025, alleging that Google abuses its dominant position in online search by misusing web content for AI Overviews, causing significant harm to online content publishers similarly situated to Plaintiff (identities to be established through discovery) in the form of traffic, readership, and revenue loss. The complaint was submitted under Article 102 of the Treaty on the

34

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Functioning of the European Union — the European equivalent of Section 2 of the Sherman Antitrust Act — and invoked the European Union's Digital Markets Act (DMA), which designates Google as a "gatekeeper" with affirmative obligations toward online publishers. The United Kingdom's Competition and Markets Authority received a parallel complaint from publisher representatives alleging substantially similar harms and legal theories. These international regulatory proceedings are relevant to this Court as corroborating evidence that the anticompetitive conduct Plaintiff alleges is globally recognized as a competition law violation, not merely a U.S. legal theory, and that the harm Plaintiff has experienced is documented and recognized across multiple jurisdictions.

83. For the purposes of this action, Plaintiff alleges that the illusory opt-out mechanisms described in this Subsection confirm the coercive nature of Google's reciprocal dealing arrangement. A genuine, non-coercive opt-out would allow publishers to decline participation in AI training and RAG use without penalty to their search visibility, and would have been available before Google began incorporating publisher content into its training datasets. No such genuine opt-out has ever existed. The absence of a genuine opt-out is not a product oversight; it is a design feature of a coercive system by which Google uses its search monopoly to extract valuable content from the online publishing ecosystem without compensation.

**F. Google's Exploitation of Plaintiff's Relevant Market — Online Legal Information Publishing and Related Legal Content Markets**

84. The relevant product market in which Plaintiff competes, and into which Google has leveraged its adjudicated General Search monopoly, is the market for **Online Legal Information Publishing** — the creation, publication, and online distribution of original civil legal information content for individual consumers, self-represented litigants, and small businesses seeking to understand civil legal rights, procedures, and available remedies. This market encompasses websites and internet platforms that produce original content addressing substantive and procedural civil law topics in a format accessible to laypersons — content that is distinct from attorney-client legal advice (which requires a licensed attorney-client relationship) and from legal citation databases (which are directed at legal professionals). The Online Legal Information Publishing market serves a large and

35

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

growing population of American adults who seek to understand the civil legal system without retaining an attorney.

85. Competing platforms within the Online Legal Information Publishing market include established legal information websites, law school affiliated public legal information resources, bar association self-help publications, federal and state court self-help resources, and online legal information publishers similarly situated to Plaintiff (identities to be established through discovery). Each of these market participants competes for the same user base — individuals seeking civil legal information — and depends, to a greater or lesser degree, on Google Search referral traffic for user acquisition, because civil legal information queries are among the most common legal-topic searches submitted to Google by ordinary Americans.

86. Google has entered the Online Legal Information Publishing market as a direct competitor through the deployment of AI Overviews. When a user submits a civil law question to Google Search — "What is the deadline to file a personal injury lawsuit in Hawaii?", "How do I file a motion to dismiss?", "What is the difference between a deposition and an interrogatory?", "Can my landlord keep my security deposit for normal wear and tear?" — Google's AI Overviews feature generates and displays a comprehensive, AI-authored answer to that question directly at the top of the SERP, in a format designed to fully satisfy the user's informational need without requiring any further navigation. Google is not merely distributing information from other market participants; it is producing and distributing its own AI-generated legal information content and delivering it directly to users in a premium, above-the-fold position that displaces all organic results from publishers in the Online Legal Information Publishing market.

87. What makes this market entry uniquely anticompetitive is that Google's AI Overviews content is generated using content misappropriated from the same publishers it displaces. Google's AI Overviews do not produce original legal information independent of publisher content; they synthesize AI-generated responses from publisher content incorporated through LLM training and RAG retrieval. When Google's AI Overviews answers a civil law question, it draws upon legal information content that was crawled from Plaintiff's website and other Online Legal Information Publishing market participants without consent or compensation — and then uses that synthesized

36

answer to directly compete with and displace those very publishers from the SERP positions where they would otherwise appear. This is not independent innovation competing with existing market participants on the merits; it is misappropriation of market participants' proprietary assets followed by leveraged market entry using those appropriated assets. No free-market competitive process could produce this outcome; it is possible only because of Google's monopoly power over Search Referral Traffic.

88. The barriers to entry in the Online Legal Information Publishing market that Plaintiff has successfully overcome through years of investment and expertise are substantial. First, the market requires legal expertise: a publisher in this market must be able to accurately interpret and explain applicable statutes, court rules, and case law — a non-trivial skill set that requires sustained legal research and editorial competence. Second, the market requires a large, comprehensive, and regularly maintained content library: users searching for civil legal information expect to find comprehensive coverage of relevant topics on a platform they can rely upon, requiring sustained investment in content production and updating. Third, the market imposes significant trust and accuracy standards: civil legal information must be legally accurate and current, because users may rely on it in making real legal decisions with real legal consequences — this trust is built over time through consistent quality and editorial diligence. Fourth, the market requires technical infrastructure: website development, hosting, content management, and the technical expertise to optimize content for search engine indexing. Google has bypassed all of these barriers by appropriating the content of market participants — including Plaintiff — rather than investing in the expertise and time required to produce comparable content independently.

89. Google's entry into the Online Legal Information Publishing market through AI Overviews simultaneously harms market competition in two distinct ways. First, Google's AI Overviews generate AI-produced legal information content that, because it is displayed at the top of the SERP, captures user attention and satisfaction for a large proportion of the civil law queries on which market participants depend for traffic, reducing those market participants' revenues and their ability to invest in further content creation. Second, because Google's AI Overviews are trained and grounded on publisher content extracted without compensation, Google's effective cost of content production is

37

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

artificially near-zero — an unfair competitive advantage that no legitimate entrant could replicate and that would not exist but for Google's monopoly-enabled content misappropriation.

90. Google's conduct also has downstream effects on competing publishers in the Online Legal Information Publishing market (identities to be established through discovery). As Plaintiff's traffic declines and as the revenues of publishers in this market are reduced by AI Overviews displacement, smaller publishers with fewer resources than larger platforms may be forced to reduce content production, stop updating existing content, or exit the market entirely. This consolidation of Online Legal Information Publishing reduces the diversity and independence of civil legal information available to the public and concentrates informational power in Google's AI-generated answers — answers that are not subject to the editorial standards, legal accuracy obligations, or publisher accountability that characterize the content produced by independent publishers in this market.

91. The geographic scope of the relevant market for Online Legal Information Publishing is the United States. While some civil law topics are jurisdiction-specific (state statutes of limitations, state eviction procedures, state small claims thresholds), a substantial body of civil legal information is applicable across United States jurisdictions — federal civil procedure, federal constitutional rights, federal consumer protection law — and the user base for online civil legal information is nationwide. Plaintiff's Online Publishing Business serves users throughout the United States, and the harm from Google's AI Overviews displacement of Plaintiff's content is a nationwide harm, though its economic impact is borne by Plaintiff in the District of Hawaii.

92. Plaintiff further alleges that the appropriate antitrust market definition for purposes of this Complaint includes, as separate relevant markets, the following: (1) the market for General Search Services (previously defined in Section V.1 and adjudicated in the DOJ Monopoly Decision); (2) the market for Online Legal Information Publishing; and (3) the market for Search Referral Traffic — the organic clicks delivered from a general search engine to publisher websites, which constitute a distinct product on which online publishers depend for user acquisition and which Google provides on terms it sets unilaterally. Each of these markets is more fully defined and analyzed in Section V below.

38

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

93. Plaintiff avers that discovery will establish the specific identities and market positions of the competing publishers in the Online Legal Information Publishing market that have been similarly harmed by Google's AI Overviews displacement, including online legal information publishers similarly situated to Plaintiff (identities to be established through discovery), and that expert economic analysis will establish the market share data, traffic impact data, and revenue impact data necessary to fully quantify the competitive harm to the Online Legal Information Publishing market caused by Google's leveraged entry through AI Overviews.

## G. Google's Systematic Pattern of Anticompetitive Conduct Across Markets

94. The conduct alleged in this Complaint does not occur in isolation. It is the most recent manifestation of Google's systematic and documented corporate strategy of monopolization across multiple adjacent markets in the internet economy, a strategy that has now been adjudicated as unlawful by United States federal courts in two separate proceedings and is the subject of ongoing regulatory action in multiple jurisdictions. The context of this pattern is essential to understanding the nature and scope of the antitrust violation alleged herein, and to evaluating the likelihood that, absent judicial intervention, Google's anticompetitive conduct will continue and expand.

95. Google's adjudicated anticompetitive conduct spans the following markets: (a) **General Search Services** — monopoly adjudicated by Judge Mehta in United States v. Google LLC, No. 1:20-cv-03010-APM, 2024 WL 3647498 (D.D.C. Aug. 5, 2024), maintained through $26.3 billion in annual exclusive default-placement payments (2021) to Apple, Samsung, Mozilla, AT&T, and other device manufacturers, browser developers, and wireless carriers; (b) **General Search Text Advertising** — supracompetitive pricing monopoly adjudicated in the same DOJ Monopoly Decision; (c) **Publisher Ad Servers and Open Web Display Advertising Exchanges** — monopoly adjudicated by the Eastern District of Virginia in United States v. Google LLC (Ad Tech), No. 1:23-cv-00108-LKG (E.D. Va. Apr. 17, 2025), finding Google liable for monopolizing the tools that publishers use to manage and sell display advertising inventory on their own websites; and (d) **Online Legal Information Publishing** — alleged in this Complaint as a market into which Google has leveraged its General Search monopoly through AI Overviews using publisher content misappropriated without consent or compensation.

39

96. The consistency of Google's monopolization strategy across these markets is striking: in each market, Google uses its dominant position in a bottleneck resource — the search engine, the ad server, the ad exchange — to exclude or disadvantage competitors, entrench its own dominant position, and extract value from market participants who have no viable alternative to using Google's products. In the General Search market, Google paid billions to exclude competitors from device distribution channels. In the ad tech markets, Google acquired and integrated competing ad tech platforms while establishing rules that systematically advantaged Google's own ad products over competitors'. In the Online Legal Information Publishing market, Google uses content crawled from independent publishers to train and ground AI Overviews that directly compete with those same publishers in the very market where they provide content to Google, using the publishers' own content against them.

97. This pattern of conduct reflects a coherent and consistent corporate strategy that has been sustained across multiple business units, across multiple leadership transitions, and across multiple regulatory environments — evidence that the anticompetitive conduct alleged in this Complaint is not a matter of inadvertent competitive externality but a deliberate corporate choice to exploit market power rather than compete on the merits. The $26.3 billion in exclusive default-placement payments in 2021 alone — a sum exceeding the entire annual revenue of most major online publishers — confirms that Google allocates extraordinary resources to maintaining its monopoly positions across markets when it determines that doing so is strategically necessary.

98. International regulators have recognized the systemic character of Google's anticompetitive conduct in the search and AI markets. The European Commission designated Google as a "gatekeeper" under the EU Digital Markets Act (DMA), imposing affirmative obligations on Google with respect to its treatment of online publishers and business users, including obligations to: provide publishers with meaningful access to the data Google collects about user interactions with their content; negotiate in good faith with publishers seeking to license their content; and refrain from using publisher content for purposes not consented to by publishers. The UK's Competition and Markets Authority has opened parallel investigations into Google's AI Overviews practices. These international regulatory actions corroborate the competitive harm Plaintiff alleges and confirm that

40

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

the conduct at issue is recognized as anticompetitive by regulatory authorities across multiple jurisdictions with sophisticated competition law frameworks.

99. The pattern of anticompetitive conduct established in the foregoing paragraphs is directly relevant to this Court's evaluation of Plaintiff's claims under Sections 1 and 2 of the Sherman Antitrust Act. The DOJ Monopoly Decision and the Ad Tech monopoly decision constitute judicial admissions, in the form of binding findings of fact by sister federal courts, that Google has engaged in unlawful monopolization in multiple markets. The remedies court's September 2, 2025 order, extending remedies to generative AI technologies, confirms judicial recognition that Google's AI Overviews deployment is an extension and continuation of its monopoly maintenance strategy. Against this documented background of systematic anticompetitive conduct, the specific conduct alleged by Plaintiff — Google's coercive extraction of free content for AI training and RAG use, and its leveraged entry into the Online Legal Information Publishing market — is not an aberration but a predictable and documented continuation of Google's corporate monopolization strategy.

## V. RELEVANT MARKETS

100. **Market One — General Search Services.** The first relevant market is the market for General Search Services in the United States. General Search Services are services that enable users to conduct open-ended, exploratory searches of the publicly accessible internet and to receive a ranked list of results relevant to their query, encompassing all topics and subject matters. General Search Services are not substitutable by vertical or specialized search tools (such as product search engines, travel booking engines, mapping services, or social media search functions), because those tools serve narrow, subject-matter-specific search purposes and cannot answer the range and type of queries — including open-ended informational queries of the type submitted to Plaintiff's content — that general search engines address. General Search Services are not substitutable by AI chat interfaces (such as standalone ChatGPT or Perplexity AI) for purposes of publishers' market participation, because those interfaces do not provide the organic search result listing placement on which publisher traffic distribution depends, and because users accessing AI chat interfaces as their primary information channel do not generate referral traffic to publisher websites. The geographic scope of the relevant General Search Services market is the United States. Google holds

41

approximately **89.2%** of all U.S. general search query volume, rising to **94.9%** on mobile devices. This market has been adjudicated as a relevant product market in which Google holds monopoly power by the United States District Court for the District of Columbia. United States v. Google LLC, No. 1:20-cv-03010-APM, 2024 WL 3647498, at *22–*35 (D.D.C. Aug. 5, 2024).

101. **Market Two — Online Legal Information Publishing.** The second relevant market is the market for Online Legal Information Publishing in the United States. This market encompasses the creation, publication, and online distribution of original civil legal information content — including articles, guides, Q&A resources, statute analyses, case law summaries, and practice-area resources — directed at individual consumers, self-represented litigants, and small businesses seeking to understand civil legal rights, procedures, and remedies without retaining a licensed attorney. The relevant product is original, publisher-created online civil legal information content, which is not reasonably interchangeable with: (a) attorney-client legal advice, which requires a licensed attorney-client relationship and is subject to professional responsibility rules; (b) legal citation databases used by legal professionals (such as Westlaw or LexisNexis), which are directed at lawyers and legal researchers rather than laypersons; or (c) AI-generated legal information produced by general-purpose AI chat interfaces, which lack the editorial standards, legal accuracy oversight, and contextual completeness of independently published content. Within the Online Legal Information Publishing market, products compete on the basis of legal accuracy, comprehensiveness of coverage, user experience, search visibility, and trustworthiness. Google has entered this market as a direct competitor through AI Overviews while simultaneously monopolizing the search distribution channel on which all market participants depend — a leveraging of monopoly power into an adjacent market that constitutes the core antitrust violation alleged herein. The geographic scope of the Online Legal Information Publishing market is the United States.

102. Google's dual role in the Online Legal Information Publishing market — as simultaneously the monopolist gatekeeper of the search distribution channel and a direct competitor in the content market — is the defining structural characteristic of the antitrust violation alleged herein. A monopolist search engine that also produces competing content (through AI Overviews) and uses publisher content to train and ground that competing content, while controlling the search

42

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

distribution channel on which those publishers depend for survival, is engaged in precisely the leveraging conduct that Section 2 of the Sherman Antitrust Act is designed to prohibit. The conduct is anticompetitive not because AI Overviews produces bad answers — it may produce technically accurate answers — but because it uses publisher content to generate those answers without compensation, distributes them through a monopoly channel that forecloses publisher competition, and destroys the economic foundation on which publisher content creation depends.

103. **Market Three — Search Referral Traffic.** The third relevant market is the market for Search Referral Traffic in the United States. Search Referral Traffic consists of the organic clicks delivered from a general search engine to a publisher's website — the direct, intent-driven navigation of a user from a general search engine result to a publisher's site. Search Referral Traffic is a distinct product that is not reasonably interchangeable with other sources of online traffic, including: (a) social media referral traffic, which is generated by user sharing and algorithmic promotion of content on social media platforms and is qualitatively different in user intent and behavior from search traffic; (b) direct navigation traffic, which occurs when users navigate directly to a publisher's website without being referred by a search engine — this traffic source is dependent on prior user familiarity with the publisher's brand and cannot be organically grown by new publishers; (c) email newsletter traffic, which reaches users who have already subscribed to a publisher's content and cannot serve as a primary user acquisition channel; and (d) referral traffic from other websites, which is neither scalable nor systematically cultivable in the same manner as search traffic. Search Referral Traffic is uniquely characterized by user intent — a user who submits a civil law question to a general search engine and clicks on a result is actively seeking the specific information that the publisher provides, making search-referred users more valuable to publishers (in terms of advertising conversion rates, engagement, and return visit rates) than users reached through other traffic channels.

104. Google is the sole commercially significant provider of Search Referral Traffic in the United States, controlling approximately 89.2% of all organic search traffic flow to publisher websites. The "price" of Search Referral Traffic from Google — i.e., the conditions Google imposes as a prerequisite for organic search listing placement — is set by Google unilaterally, without

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

negotiation, without competitive constraint, and without publisher input. Historically, the price was access (allowing Google to crawl and index publisher content). Google has now, using its monopoly power, unilaterally expanded the "price" to include three additional uses: republishing in SERP features, incorporation into AI training datasets, and use as RAG grounding context for AI Overviews. Publishers have no ability to negotiate this price or to reject it without losing access to the Search Referral Traffic on which their businesses depend. This is a paradigm example of monopoly pricing — the unilateral imposition of terms that would not prevail in a competitive market.

105. The three relevant markets described in this Section are interconnected in the manner that defines the antitrust violation alleged herein: Google's monopoly power in the General Search Services market gives it monopoly control over the Search Referral Traffic market, which it exploits to extract free content from participants in the Online Legal Information Publishing market (and other online publishing markets), and then uses that free content to power AI Overviews that directly compete with and displace those same publishers in the Online Legal Information Publishing market. The harm flows sequentially from Google's General Search monopoly, through its control of Search Referral Traffic, into the Online Legal Information Publishing market — a causal chain that connects Plaintiff's injury directly and proximately to Google's adjudicated monopoly power, establishing the antitrust injury and standing elements addressed in Section VI.

## VI. ANTITRUST INJURY AND STANDING

106. Plaintiff Theodore Haugland has standing to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, as a "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Plaintiff's standing is established through application of the five-factor test articulated by the United States Supreme Court in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 537–45 (1983), which courts apply to determine whether a plaintiff's claimed injury is of the type that authorizes private antitrust recovery under the Clayton Act. Each factor weighs in Plaintiff's favor.

107. Factor One — Antitrust Injury. Plaintiff has suffered antitrust injury — injury "of the type the antitrust laws were designed to prevent" and that "flows from that which makes defendants'

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Google's coercive reciprocal dealing and monopoly leveraging injure Plaintiff in the following ways, each of which is of the type the antitrust laws were designed to prevent: (a) **Destruction of competitive price signals**: by extracting publisher content for free through monopoly coercion, Google prevents a competitive market rate for AI training and RAG content from forming or operating — publishers cannot charge the market rate for their content because Google extracts it without payment through its control of an irreplaceable distribution channel; (b) **Monopoly leveraging into adjacent market**: Google uses its General Search monopoly to enter the Online Legal Information Publishing market with an unfair advantage — free content — that independent competitors cannot replicate, suppressing competition in that market; (c) **Displacement of independent publishers**: AI Overviews, powered by misappropriated content, displace independent publishers from the SERP positions where they would otherwise appear, reducing their traffic, revenues, and capacity to invest in content creation; and (d) **Entrenchment of Google's search monopoly**: free publisher content makes AI Overviews more capable, which increases user engagement with Google's SERP, which entrenches Google's search monopoly — a self-reinforcing cycle of monopoly entrenchment through misappropriation. Each of these competitive harms falls squarely within the categories of injury the Sherman and Clayton Acts were designed to prevent.

108. **Factor Two — Directness of Injury.** Plaintiff is directly and immediately injured by Defendants' anticompetitive conduct. The causal chain between Google's conduct and Plaintiff's injury is short and does not require the intervention of any third party: (1) Google crawls [Plaintiff's Internet Domain(s), to be identified in discovery] and incorporates Plaintiff's content into LLM training datasets and RAG retrieval indices; (2) Google uses Plaintiff's content, without consent or compensation, to train the models underlying Gemini and AI Overviews and to generate real-time AI Overview responses; (3) Google displays AI Overview responses at the top of the SERP for civil law queries, above the organic results where Plaintiff's content would otherwise appear; (4) Users receive responsive civil law information from Google's AI Overview without clicking through to [Plaintiff's Internet Domain(s), to be identified in discovery]; (5) Plaintiff loses the advertising impression that would otherwise have been generated by the user visit; (6) Plaintiff's aggregate

45

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

advertising revenue declines proportionally to the volume of traffic diverted. This is a direct, two-step causal chain — Google's conduct, Plaintiff's injury — with no intervening actors and no speculative links.

109. **Factor Three — Causation.** Plaintiff's injury is directly and proximately caused by Google's anticompetitive conduct. Causation is established by: (a) Google's own internal research — Marc Najork's July 2023 acknowledgment that AI-generated direct answers "reduce search referral traffic" and "reduce referrals to content providers hurting their ability to monetize" — confirming that the traffic diversion mechanism is a predicted and recognized consequence of AI Overviews; (b) Industry-wide data from SimilarWeb (zero-click share rising from 56% to 69%, May 2024–May 2025) demonstrating a measurable, systemic increase in zero-click search behavior directly attributable to the AI Overviews rollout; (c) The Raptive publisher impact study (March 2024) projecting 20%–60% traffic declines for online publishers in content categories served by AI Overviews; (d) Gartner Research's February 2024 prediction that overall search volume will decline by 25% by 2026 due to AI-generated answer displacement; and (e) Plaintiff's own web analytics data, to be produced in discovery, demonstrating a material decline in search referral traffic from Google following the May 14, 2024 AI Overviews rollout. Plaintiff avers that expert economic analysis will establish a direct and statistically significant causal relationship between the AI Overviews rollout and Plaintiff's traffic and revenue decline.

110. **Factor Four — No Risk of Duplicative Recovery.** Plaintiff is the direct victim of the coercive content extraction and AI Overviews displacement alleged herein. Any damages awarded to Plaintiff will represent Plaintiff's own direct losses — lost advertising revenue and lost user acquisition — attributable to the diversion of Plaintiff's search referral traffic by Google's AI Overviews. There is no risk of duplicative recovery because: (a) Plaintiff is not an intermediary; he is the direct publisher whose content was used and whose traffic was diverted; (b) No other party has a superior or equal claim to the specific portion of Plaintiff's advertising revenues lost as a result of traffic diverted from [Plaintiff's Internet Domain(s), to be identified in discovery] specifically; and (c) Plaintiff does not seek damages on behalf of any other publisher or any class of third parties in this action. Plaintiff seeks only his own damages, trebled under the Clayton Act.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

111. **Factor Five — No Complexity of Apportionment.** Plaintiff's damages are directly calculable and not subject to complex apportionment problems. Plaintiff's damages consist of: (a) Lost advertising revenue — the difference between the advertising revenues Plaintiff would have earned from the search referral traffic that Google's AI Overviews diverted, and the advertising revenues Plaintiff actually earned, for the period from May 14, 2024 (AI Overviews nationwide rollout) through the date of judgment; and (b) Lost unjust enrichment value — the fair market value of the content Google used for LLM training and RAG grounding without compensation, calculated by reference to the market rates that Google's AI competitors have paid for equivalent content licensing rights. These damages are calculable through: Plaintiff's Google Analytics or equivalent web analytics data showing traffic volume before and after May 14, 2024; Plaintiff's Google AdSense or equivalent advertising platform data showing advertising revenue per visit and aggregate revenue; expert economic analysis comparing Plaintiff's actual traffic and revenue trajectory to a but-for counterfactual absent AI Overviews; and market comparables from content licensing agreements entered by Google's competitors (to be obtained through discovery). The damages calculation is straightforward and does not require complex apportionment among multiple injured parties.

112. Plaintiff further satisfies the antitrust standing requirements as articulated by the Ninth Circuit in Image Technical Services, Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1210 (9th Cir. 1997), and Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008): Plaintiff is a direct market participant in the Online Legal Information Publishing market (a market participant who competes with Google's AI Overviews for the same users seeking civil law information), in the Search Referral Traffic market (as a publisher whose referral traffic Google controls and on whose search listing placement Google imposes unlawful conditions), and as a direct object of the coercive reciprocal dealing arrangement (Google conditions Plaintiff's access to Search Referral Traffic on Plaintiff providing content for republishing, AI training, and RAG use). As a direct competitor injured by Google's leveraged monopoly entry into Plaintiff's market using Plaintiff's own content, Plaintiff is precisely the type of plaintiff antitrust standing doctrine was designed to protect.

113. Plaintiff has suffered cognizable injury to his "business or property" within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiff's Online Publishing Business has suffered material financial losses in the form of reduced search referral traffic and reduced advertising revenue following the May 14, 2024 AI Overviews rollout. The specific dollar amount of these losses will be established through discovery and expert economic analysis. In addition, Plaintiff has suffered the loss of the fair market value of the right to license his content for AI training and RAG use — a right that competing AI companies have purchased from publishers at market rates and that Google has appropriated without compensation through its monopoly coercion. Each of these losses constitutes an injury to Plaintiff's "business or property" sufficient to confer standing under Section 4 of the Clayton Act and to entitle Plaintiff to the treble damages, injunctive relief, and attorneys' fees provided by the Clayton Act.

## COUNT I

### UNLAWFUL RECIPROCAL DEALING

### (SHERMAN ANTITRUST ACT § 1, 15 U.S.C. § 1)

114. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

115. Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, prohibits every contract, combination, or conspiracy in restraint of trade or commerce among the several states. Unlawful reciprocal dealing — a form of coercive tying — constitutes a per se violation of Section 1 when practiced by a firm with market power, or alternatively constitutes an unreasonable restraint of trade under the Rule of Reason when it has the purpose or effect of foreclosing competition in a relevant market. Google's conduct as described herein constitutes unlawful reciprocal dealing under both standards.

116. Google's unlawful reciprocal dealing arrangement operates as follows: Google conditions the provision of Search Referral Traffic — a product it monopolizes — on publishers simultaneously providing three additional distinct products to Google without compensation: (1) **Republishing Content** — publisher content for reproduction in Featured Snippets, People Also Ask panels, and AI Overviews on Google's SERP; (2) **AI Training Content** — publisher content for incorporation

48

into the training datasets used to train the large language models underlying Gemini and AI Overviews; and (3) **RAG Grounding Content** — publisher content for real-time retrieval and use as grounding context in generating AI Overview responses. Each of these is a distinct product with independent commercial value: competitive AI companies pay market rates for comparable training and RAG content rights; the right to reproduce publisher content in publisher-facing SERP features has independent commercial value recognized in the news licensing agreements that Google has entered in certain international markets.

117. The structure of the challenged arrangement is quintessentially reciprocal: Google provides Search Referral Traffic to Plaintiff; Plaintiff must in return provide content for republishing, AI training, and RAG use to Google. The exchange is not voluntary or market-determined; it is coercively imposed by Google through its monopoly control over Search Referral Traffic. Publishers who decline to provide any element of the reciprocal "payment" — by blocking Googlebot — are excluded from Google's search index and lose access to Google's monopolized Search Referral Traffic. This coercive conditioning of one product's provision on the provision of three others constitutes an unlawful reciprocal dealing arrangement prohibited by Section 1 of the Sherman Antitrust Act.

118. Google possesses market power — specifically, adjudicated monopoly power — in the tied product market (Search Referral Traffic / General Search Services). This market power is the essential enabling condition for the coercive reciprocal dealing arrangement: absent monopoly power over Search Referral Traffic, publishers could credibly refuse Google's terms and seek alternative distribution channels. Because no commercially viable alternative exists, publishers cannot refuse, and Google's coercive reciprocal dealing succeeds.

119. Plaintiff alleges that Google's unlawful reciprocal dealing constitutes a per se violation of Section 1 of the Sherman Antitrust Act. Reciprocal dealing enforced by a monopolist through the threat of exclusion from an indispensable distribution channel, and conditioning access to the monopolized product on the provision of multiple distinct free products, is the type of arrangement that has been consistently condemned as per se unreasonable because its principal effect is to coercively extract value from market participants who have no competitive alternative. The per se

49

rule is appropriate here because the conduct serves no conceivable pro-competitive purpose — the free content Google extracts through coercion is commercially available through voluntary market licensing, and Google's refusal to pay market rates is not a matter of legitimate cost management but a deliberate exploitation of monopoly power.

120. In the alternative, Plaintiff alleges that Google's unlawful reciprocal dealing constitutes an unreasonable restraint of trade under the Rule of Reason standard applied by the Ninth Circuit. Under the Rule of Reason, a court weighs the anticompetitive effects of the challenged arrangement against any asserted pro-competitive justifications. The anticompetitive effects of Google's reciprocal dealing arrangement are substantial and documented: destruction of competitive price signals for publisher content; suppression of publisher revenues and investment in content creation; leveraged entry by Google into the Online Legal Information Publishing market using appropriated publisher content; and entrenchment of Google's search monopoly. Google's pro-competitive justifications, if any, are negligible: Google does not need free access to publisher content to provide search listing services; the access-for-traffic exchange was the historical "price" of search listing placement, and there is no legitimate competitive justification for expanding that price to include AI training and RAG content rights without compensation. The Rule of Reason balance strongly favors a finding of antitrust violation.

121. In the further alternative, Plaintiff alleges that a "quick look" analysis is appropriate here, under which the court applies an abbreviated Rule of Reason requiring the defendant to offer a legitimate pro-competitive justification when the anticompetitive nature of the conduct is facially apparent. The facially anticompetitive character of conditioning a monopolized product on the free provision of three distinct additional products — when a fair market price for those products is commercially available — is apparent without extensive market analysis, warranting the abbreviated "quick look" Rule of Reason standard.

122. Google's unlawful reciprocal dealing arrangement has directly and proximately caused Plaintiff's antitrust injury as described in Section VI. By conditioning Search Referral Traffic on Plaintiff providing content for republishing, AI training, and RAG use without compensation, Google has: (a) extracted the commercial value of Plaintiff's content licensing rights without

50

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

payment; (b) used that extracted content to build and power AI Overviews that directly displace Plaintiff from the SERP positions on which his advertising revenue depends; and (c) deprived Plaintiff of the advertising revenue that would have been generated by the traffic diverted to Google's AI Overviews. Each of these injuries is a direct consequence of Google's unlawful reciprocal dealing arrangement.

123. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count I: (a) Treble compensatory damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be proven at trial, representing all advertising revenue lost by Plaintiff as a direct result of Defendants' unlawful reciprocal dealing arrangement; (b) Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting Defendants from conditioning Search Referral Traffic on publishers providing content for republishing, AI training, or RAG use without fair market compensation; and (c) Reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT II

### UNLAWFUL MONOPOLY MAINTENANCE THROUGH RECIPROCAL DEALING

### (SHERMAN ANTITRUST ACT § 2, 15 U.S.C. § 2)

124. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

125. Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, prohibits any person from willfully maintaining a monopoly through exclusionary conduct. A defendant violates Section 2 when it (1) possesses monopoly power in a relevant market, and (2) willfully acquires or maintains that monopoly through exclusionary conduct — conduct that is not competition on the merits. United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966). Both elements are satisfied here.

126. Google possesses monopoly power in the General Search Services market in the United States, as adjudicated by Judge Mehta in United States v. Google LLC, No. 1:20-cv-03010-APM, 2024 WL 3647498 (D.D.C. Aug. 5, 2024). This element is established by judicial adjudication and need not be relitigated in this action.

51

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

127. Google has willfully maintained this monopoly through the exclusionary reciprocal dealing conduct described in Count I and throughout this Complaint. The maintenance mechanism operates through a self-reinforcing feedback loop: (a) Google uses its monopoly power over Search Referral Traffic to coercively extract free content from publishers for AI training and RAG use; (b) this free content makes AI Overviews more capable, more comprehensive, and more accurate, enhancing the quality and appeal of Google's SERP; (c) more capable AI Overviews increase the proportion of user queries answered directly on Google's SERP, increasing user time-on-SERP and reducing the incentive for users to adopt alternative AI-based search or information-retrieval products; (d) increased user time-on-SERP and user retention deepens Google's query volume advantage over rivals, reinforcing the scale-based feedback loop that makes it impossible for rivals to match Google's search quality; and (e) enhanced SERP engagement increases Google's search advertising revenues, which fund further AI development and further default-placement payments — further entrenching the monopoly. Each iteration of this cycle extracts additional value from publishers, degrades publishers' competitive position, and reinforces Google's monopoly — all without the need for Google to compete on the merits of its AI capabilities.

128. Google's reciprocal dealing-based monopoly maintenance is exclusionary because it forecloses fair competition in the Online Legal Information Publishing market and in the market for AI training and RAG content. By extracting publisher content for free through monopoly coercion, Google prevents a competitive market for AI training content and RAG content from developing, entrenching its advantage over AI competitors who must pay market rates for equivalent content rights. By using that free content to power AI Overviews, Google displaces independent publishers from the SERP positions where they would otherwise compete, destroying their revenues and their capacity to invest in the content that sustains the competitive process. Both effects are exclusionary within the meaning of Section 2 because they harm competition in ways that are not justified by superior competitive merit.

129. Google's conduct is willful within the meaning of Section 2. "Willfulness" does not require specific anticompetitive intent; it requires that the monopolist engage in conduct that, assessed objectively, has the predictable and actual effect of maintaining its monopoly through means other

than competition on the merits. Here, willfulness is established by: (a) Google's own internal research (Marc Najork, July 2023) confirming that its AI-generated answers would reduce publisher referral traffic; (b) Google's decision to deploy AI Overviews nationwide on May 14, 2024, without establishing any publisher compensation mechanism, despite knowing the predicted harm; (c) Google's refusal to enter content licensing agreements with publishers while its AI competitors do so; and (d) the systematic, large-scale, and deliberate nature of the AI training data collection process, which was affirmatively confirmed and expanded in Google's July 1, 2023 Privacy Policy update.

130. There is no legitimate business justification for Google's monopoly maintenance through reciprocal dealing. Google's AI Overviews could be built and deployed using licensed content at fair market rates, as demonstrated by competing AI companies. Google's refusal to pay market rates for publisher content is not a matter of competitive necessity but of monopoly convenience — Google does not need to coerce free content because it cannot afford to pay for it; it coerces free content because its monopoly power makes the coercion possible and profitable. The absence of any competitive necessity for the conduct, combined with its predictable monopoly-maintaining effects, confirms that the conduct constitutes willful monopoly maintenance prohibited by Section 2.

131. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count II: (a) Treble compensatory damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; (b) Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; and (c) Reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT III

### UNLAWFUL MONOPOLY MAINTENANCE THROUGH TORTIOUS CONTENT MISAPPROPRIATION

### (SHERMAN ANTITRUST ACT § 2, 15 U.S.C. § 2)

132. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

133. Section 2 of the Sherman Antitrust Act prohibits not only coercive dealing arrangements but also tortious conduct that maintains a monopoly through means other than competition on the

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

merits. Google's misappropriation of Plaintiff's proprietary content — the product of years of investment, expertise, and editorial labor — to train the large language models underlying Gemini and AI Overviews, and to provide real-time RAG grounding context for AI Overview responses, constitutes tortious content misappropriation that has maintained Google's General Search monopoly through means other than competition on the merits, in violation of Section 2.

134. The misappropriation of Plaintiff's content for LLM training constitutes tortious conduct actionable under Section 2 because: (a) Plaintiff's content is a proprietary product of substantial investment and expertise, not merely publicly posted text; (b) Google incorporated Plaintiff's content into LLM training datasets without obtaining Plaintiff's consent, a license, or any form of compensation; (c) the incorporation of Plaintiff's content into LLM training datasets has produced economic value for Google — model parameters encoding the knowledge and structural patterns of Plaintiff's content — that Google has monetized through AI Overviews advertising revenues; and (d) this economic value was obtained by Google at zero cost due to its monopoly power, when competing AI firms would have needed to pay market rates for equivalent content rights. The misappropriation deprives Plaintiff of the licensing revenue he would have received in a competitive market for AI training content rights — revenue that Google's monopoly power allows it to avoid paying.

135. The misappropriation of Plaintiff's content for real-time RAG grounding constitutes tortious conduct actionable under Section 2 because: (a) at query time, Google's AI Overviews system retrieves current content from Plaintiff's website — content that Plaintiff continues to invest resources in producing and updating — and uses that content as real-time grounding context to generate AI Overview responses; (b) this real-time retrieval and use of Plaintiff's content occurs without Plaintiff's consent, a license, or compensation for each instance of use; (c) each AI Overview response grounded by Plaintiff's content generates advertising revenue for Google from advertising placements adjacent to the AI Overview; and (d) the user who receives the AI Overview response grounded by Plaintiff's content does not visit [Plaintiff's Internet Domain(s), to be identified in discovery], depriving Plaintiff of the advertising revenue that would have been generated by that user visit.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

136. The tortious content misappropriation alleged herein has maintained Google's General Search monopoly by enabling Google to build AI Overviews without acquiring content rights through fair market processes. The essential competitive constraint on Google's development of AI Overviews — the need to obtain content rights from publishers at market rates — has been eliminated by Google's monopoly power, which allows it to extract those rights for free. This artificial cost advantage, available only through monopoly coercion, has enabled Google to build and deploy AI Overviews at a scale and speed that would not be achievable if Google were required to pay market rates for the publisher content on which AI Overviews depends. The cost advantage maintained through content misappropriation is therefore an exclusionary benefit that maintains Google's monopoly in General Search Services.

137. That competing AI companies have entered content licensing agreements with major media and publishing companies (identities to be established through discovery) — paying market rates for the right to use publisher content for AI training and retrieval — demonstrates that a fair market rate for publisher content AI rights exists and is commercially available. Google's refusal to pay that market rate, enabled by its monopoly power, is not a legitimate competitive strategy; it is monopoly maintenance through misappropriation. If Google were forced to compete for publisher content on equal market terms with OpenAI and other AI competitors, the costs of building AI Overviews would be substantially higher, the competitive advantage of AI Overviews over competing AI products would be reduced, and the harm to publishers would be mitigated. The current situation — in which only Google can extract publisher content for free while all other AI companies must pay — is a product of monopoly power, not competitive merit.

138. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count III: (a) Treble compensatory damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, representing the fair market value of the content licensing rights misappropriated by Defendants, and all advertising revenues lost as a result of traffic diverted by AI Overviews powered by Plaintiff's misappropriated content; (b) Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting Defendants from using content crawled from Plaintiff's website for LLM

training or RAG grounding without obtaining a license at fair market rates; and (c) Reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT IV

### UNLAWFUL MONOPOLY LEVERAGING INTO ADJACENT MARKET

### (SHERMAN ANTITRUST ACT § 2, 15 U.S.C. § 2)

139. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

140. Section 2 of the Sherman Antitrust Act prohibits the willful use of monopoly power in one market to gain a competitive advantage or monopoly in an adjacent market. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 479–83 (1992). Google has leveraged its adjudicated monopoly power in General Search Services — a monopoly in the market for search traffic distribution — into the Online Legal Information Publishing market, by using publisher content misappropriated through its search monopoly to enter and compete in the publishing market where those same publishers operate.

141. The leveraging mechanism operates in the following stages: (a) Google uses its monopoly power in General Search Services to coercively extract free content from Plaintiff and online legal information publishers similarly situated to Plaintiff (identities to be established through discovery), incorporating that content into LLM training datasets and RAG retrieval indices; (b) Google uses that content to power AI Overviews — an AI-generated civil legal information product that directly competes with Plaintiff and other Online Legal Information Publishing market participants for the same users who seek civil legal information; (c) Google distributes AI Overviews through its dominant search engine — the same distribution channel through which it controls access to Plaintiff's market — giving AI Overviews automatic distribution to 89.2% of all U.S. search queries and a premium above-the-fold display position above all organic results; and (d) by simultaneously controlling the distribution channel and operating a competing product powered by misappropriated content, Google has achieved a structural competitive advantage in the Online Legal Information Publishing market that is entirely traceable to its search monopoly and the tortious conduct it enables.

56

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

142. Google's leveraging into the Online Legal Information Publishing market is not independent innovation competing on the merits. A firm that creates an AI-generated legal information product using original research, licensed content, and commercially acquired training data is competing on the merits — it is investing in and creating a superior product through legitimate means. Google, by contrast, has created an AI-generated legal information product using content misappropriated from the market participants it is now competing against, distributed through a monopoly distribution channel those market participants cannot access on equivalent terms, without paying the content acquisition costs that any legitimate market entrant would need to bear. This is leveraging in its most direct form: using monopoly power in Market A (General Search Services / Search Referral Traffic) to gain the inputs necessary to compete in Market B (Online Legal Information Publishing) without paying their fair market price.

143. The competitive harm from Google's leveraging is significant and ongoing. Google's AI Overviews, displayed at the top of the SERP above all organic results, capture the user attention and informational engagement that would otherwise accrue to Plaintiff and other Online Legal Information Publishing market participants. Because AI Overviews appear above all organic results for civil law queries, they intercept users before those users can see the organic results where Plaintiff's content would otherwise rank, eliminating or substantially reducing the probability that those users will click through to [Plaintiff's Internet Domain(s), to be identified in discovery]. The user's information need is satisfied at Google's SERP — with Google's AI Overview, built on Plaintiff's content — without any traffic or advertising revenue flowing to Plaintiff.

144. Google's leveraging of its search monopoly into the Online Legal Information Publishing market is particularly harmful because it is self-perpetuating: as publishers like Plaintiff lose traffic and revenue to AI Overviews displacement, they have less revenue to invest in content creation; as their content catalogs stagnate, their search visibility declines further; as their search visibility declines, Google's AI Overviews become the default source for civil legal information; and as Google's AI Overviews capture more of the user demand for civil legal information, Google's search advertising revenues increase, funding further AI investment. This is monopoly leveraging that feeds back into monopoly entrenchment — exactly the type of structural harm the antitrust laws prohibit.

57

145. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count IV: (a) Treble compensatory damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for all losses caused by Google's leveraged entry into the Online Legal Information Publishing market; (b) Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting Google from displaying AI Overview responses in the Online Legal Information Publishing category derived from publisher content obtained without consent or compensation; and (c) Reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT V

## UNLAWFUL MONOPOLIZATION OF GENERAL SEARCH SERVICES

## (SHERMAN ANTITRUST ACT § 2, 15 U.S.C. § 2)

146. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

147. Section 2 of the Sherman Antitrust Act prohibits monopolization of any part of trade or commerce among the several states. The Supreme Court established in United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966), that monopolization requires proof of (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. Both elements are satisfied here with respect to Google's monopoly in the General Search Services market.

148. As to the first element — possession of monopoly power — Google's monopoly power in the General Search Services market has been adjudicated by the United States District Court for the District of Columbia. United States v. Google LLC, No. 1:20-cv-03010-APM, 2024 WL 3647498 (D.D.C. Aug. 5, 2024). This Court may take judicial notice of that adjudication. Google holds approximately 89.2% of all U.S. general search query volume — substantially exceeding the threshold above which courts have uniformly found monopoly power — and 94.9% on mobile devices. The scale-based feedback loop described herein, combined with entrenched user habits and (prior to the September 2025 remedies order) exclusive default-placement agreements, makes Google's monopoly power durable and self-sustaining without the exercise of competitive merit.

58

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**149.** As to the second element — willful acquisition or maintenance — Google has willfully maintained its General Search monopoly through the following exclusionary conduct: (a) **Exclusive default-placement payments**: Google paid approximately $26.3 billion in 2021 alone to Apple, Samsung, Mozilla, AT&T, and others to maintain exclusive default search placement on billions of devices and browsers — found by Judge Mehta to constitute unlawful exclusive dealing; (b) **Coercive reciprocal dealing to extract free AI training content**: as described in Count I, Google conditions Search Referral Traffic on publishers providing free content for AI training and RAG use, reducing Google's cost of developing AI Overviews and maintaining its SERP engagement advantage; (c) **AI Overviews deployment to reduce click-throughs and disincentivize rival adoption**: by answering user queries directly on the SERP, AI Overviews reduce user incentives to adopt competing AI-based search alternatives (such as Perplexity AI or Bing with Copilot), entrenching Google's SERP as the primary information destination; and (d) **Strategic disincentivization of publisher investment in rival-beneficial content**: by reducing publisher revenues through AI Overviews traffic diversion, Google reduces publishers' capacity to invest in the original content that benefits Google's rivals as much as Google itself — content created by publishers indexed by Bing as much as by Google — thereby degrading the content ecosystem available to rivals while simultaneously extracting it for Google's own AI Overviews.

**150.** Each element of the exclusionary conduct described in 149 constitutes conduct beyond competition on the merits. Paying billions annually for exclusive default placements, extracting free publisher content through monopoly coercion, and deploying AI Overviews to reduce click-through rates (thereby reducing the utility of rival search engines for publishers) are not achievements of a superior product through competitive effort. They are deliberate exclusionary strategies designed to maintain market dominance through means other than competition on the merits — the paradigm case of willful monopolization under Section 2.

**151.** Plaintiff has suffered antitrust injury from Google's monopolization of General Search Services in the form of: (a) loss of Search Referral Traffic that would have been distributed under competitive market conditions, in which search engines would not coercively extract publisher content for AI training and would not display AI-generated answers that divert user clicks from

publisher websites; and (b) loss of the competitive market rate for the content licensing rights that Google has misappropriated through its monopoly power. These injuries are of the type the antitrust laws were designed to prevent and flow directly from Google's willful monopolization of General Search Services.

152. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count V: (a) Treble compensatory damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; (b) Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; and (c) Reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT VI

## UNLAWFUL ATTEMPTED MONOPOLIZATION OF ONLINE LEGAL INFORMATION PUBLISHING

## (SHERMAN ANTITRUST ACT § 2, 15 U.S.C. § 2)

153. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

154. Section 2 of the Sherman Antitrust Act also prohibits any attempt to monopolize any part of trade or commerce among the several states. The Supreme Court established in Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455–59 (1993), that attempted monopolization requires proof of (1) that the defendant has engaged in predatory or anticompetitive conduct, (2) with a specific intent to monopolize, and (3) a dangerous probability that it would achieve monopoly power in the relevant market. All three elements are satisfied here with respect to Google's attempted monopolization of the Online Legal Information Publishing market.

155. **Element One — Predatory or Anticompetitive Conduct.** Google has engaged in predatory and anticompetitive conduct directed at the Online Legal Information Publishing market, as described throughout this Complaint. The predatory and anticompetitive conduct includes: (a) the misappropriation of content from Plaintiff and online legal information publishers similarly situated to Plaintiff (identities to be established through discovery) to train the AI models underlying AI Overviews and to provide real-time RAG grounding context for AI Overview responses, without consent, license, or compensation; (b) the display of AI-generated legal information answers at the

60

top of Google's SERP, above all organic results from Online Legal Information Publishing market participants, using the misappropriated content of those same market participants; (c) the coercive conditioning of Search Referral Traffic on publishers providing free content for republishing, AI training, and RAG use, as described in Count I; and (d) the systematic, scalable, and deliberate nature of this conduct, which has been designed and deployed by Google with the specific goal of making Google's AI-generated answers the default destination for users seeking civil legal information. Each element of this conduct is predatory or anticompetitive within the meaning of Section 2 because it is not competition on the merits and it has the predictable and actual effect of disadvantaging competitors in the Online Legal Information Publishing market.

156. **Element Two — Specific Intent to Monopolize.** Google has demonstrated specific intent to monopolize the Online Legal Information Publishing market — and informational content markets generally — through its public statements, strategic investments, and conduct. Specific intent is established by the following evidence: (a) Google CEO Sundar Pichai's repeated public statements at shareholder meetings, Google I/O developer conferences, and earnings calls that Google's AI strategy is designed to make Google "the primary destination for any query" — including the informational queries for which users previously visited Online Legal Information Publishing market participants; (b) Alphabet's Fiscal Year 2024 Annual Report disclosing capital expenditures exceeding $52 billion for AI infrastructure — an investment scale that reflects deliberate corporate intent to dominate AI-powered information delivery, including in categories such as legal information; (c) the strategic deployment of AI Overviews as a default feature of Google Search — as opposed to an opt-in feature or a separate product — confirming Google's intent to intercept information queries at the search interface before users have the opportunity to navigate to independent publisher websites; (d) Google's refusal to compensate publishers for content used in AI training and RAG grounding, despite being aware of the harm this causes (as acknowledged by Marc Najork in July 2023) and despite competing AI companies compensating publishers for equivalent content rights — confirming Google's intent to achieve its AI-generated informational content strategy without paying the costs that competitive market participation would require; and (e) the breadth and scale of Google's AI Overviews deployment — serving over one billion users

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

globally by year-end 2024 — confirming Google's intent to achieve and maintain dominant market position in AI-generated informational content delivery.

157. **Element Three — Dangerous Probability of Achieving Monopoly Power.** There is a dangerous probability that Google will achieve monopoly power in the Online Legal Information Publishing market through its predatory and anticompetitive conduct. This probability is established by: (a) **Existing market position**: Google already holds 89.2% of all U.S. general search query volume, giving AI Overviews automatic distribution to 89.2% of all users who search for civil legal information using a general search engine — a distribution scale that no Online Legal Information Publishing market participant can independently achieve; (b) **Scale of deployment**: AI Overviews was serving over one billion users globally by December 2024, and is integrated as a default, non-optional feature of Google Search in the United States — giving it immediate, ubiquitous distribution to substantially all U.S. internet users who use Google for information searches; (c) **Financial investment**: Alphabet's $52+ billion annual AI infrastructure capital expenditure exceeds the total revenues of the Online Legal Information Publishing market many times over, giving Google the financial capacity to outspend any market competitor in AI development; (d) **Documented displacement**: the zero-click share data (56%→69%, May 2024–May 2025), Raptive publisher traffic loss predictions (20%–60%), and Gartner search volume decline projection (-25% by 2026) each confirm that Google's AI Overviews is actively and measurably displacing Online Legal Information Publishing market participants from their SERP positions, demonstrating ongoing progress toward dominance; and (e) **Absence of competitive constraint**: no Online Legal Information Publishing market participant has the resources, search distribution reach, or content acquisition advantages to resist Google's displacement — the structural conditions necessary for effective competitive resistance are absent.

158. Plaintiff has suffered antitrust injury from Google's attempted monopolization of the Online Legal Information Publishing market in the form of lost search referral traffic, lost advertising revenue, and lost content licensing revenue — injuries directly caused by the predatory conduct alleged herein. Plaintiff is a direct competitor in the Online Legal Information Publishing market

and has been directly displaced from SERP positions by Google's AI Overviews, constituting direct competitive injury from the attempted monopolization.

159. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count VI: (a) Treble compensatory damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; (b) Permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting Defendants from engaging in the predatory conduct described herein directed at the Online Legal Information Publishing market; and (c) Reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT VII

## COMMON LAW UNJUST ENRICHMENT

## (HAWAII COMMON LAW)

160. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein. This Court has supplemental jurisdiction over this Count pursuant to 28 U.S.C. § 1367(a), as it arises from the same common nucleus of operative facts as Plaintiff's federal antitrust claims.

161. Under Hawaii common law, a claim for unjust enrichment requires proof that: (1) a benefit was conferred upon the defendant by the plaintiff; (2) the defendant appreciated the benefit, or had knowledge of the benefit; and (3) the defendant accepted and retained the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. Durette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 504, 100 P.3d 60, 74 (2004). All three elements are satisfied here.

162. **Element One — Benefit Conferred.** Plaintiff has conferred substantial economic benefits upon Defendants through the creation and publication of original civil legal information content at [Plaintiff's Internet Domain(s), to be identified in discovery]. These benefits include: (a) **LLM Training Data**: Plaintiff's original content — produced through years of personal investment, legal research, and editorial labor — was crawled by Google and incorporated into the training datasets used to train the large language models underlying Gemini and AI Overviews. The training data conferred by Plaintiff's content enabled the Gemini and AI Overviews models to learn the language

63

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

patterns, factual content, and structural conventions of civil legal information — capabilities that these models use to generate the AI Overview responses from which Defendants earn advertising revenues. This benefit has a measurable fair market value, as demonstrated by the content licensing agreements that Google's AI competitors have entered with major media and publishing companies (identities to be established through discovery) at commercially negotiated rates; (b) **Real-Time RAG Grounding Context**: Plaintiff's content, as it continues to be maintained and updated at [Plaintiff's Internet Domain(s), to be identified in discovery], is retrieved in real time by Google's AI Overviews system as grounding context for generating responses to civil law queries. Each RAG retrieval of Plaintiff's content provides Google's AI system with the specific, current, and accurate civil legal information that allows AI Overviews to generate a responsive and accurate answer — a direct economic benefit to Defendants, as more accurate AI Overview responses drive higher user engagement and higher advertising revenue; (c) **AI Overviews Advertising Revenue**: Defendants earn advertising revenue from advertising placements served adjacent to or within AI Overview responses that are grounded by Plaintiff's content. This advertising revenue is a direct economic benefit conferred upon Defendants by Plaintiff's content — without the accuracy and authority of content from publishers like Plaintiff, AI Overview responses would be less reliable, users would engage less with AI Overviews, and advertising revenues would be lower.

163. **Element Two — Appreciation or Knowledge of the Benefit.** Defendants have both appreciated and have actual knowledge of each category of benefit conferred by Plaintiff's content. Defendants' knowledge is established by: (a) **Google's own Privacy Policy update (July 1, 2023)**: Google's affirmative update of its Privacy Policy to explicitly confirm that it uses publicly available web content — content crawled by Googlebot from publisher websites — to train its AI models, including Gemini and Bard, constitutes Google's own written acknowledgment of its deliberate use of publisher content for AI training purposes; (b) **Marc Najork's July 2023 acknowledgment**: Google's own Distinguished Research Scientist acknowledged that AI-generated direct answers use publisher-created content and that they "reduce referrals to content providers hurting their ability to monetize" — confirming that Google's most senior AI researchers understand and appreciate the economic value of publisher content to their AI systems, as well as the harm its extraction causes;

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

(c) **Google's Googlebot crawling of [Plaintiff's Internet Domain(s), to be identified in discovery]**: Google has actively, deliberately, and repeatedly crawled Plaintiff's website using its Googlebot crawler, acquiring Plaintiff's content for use in Google's search index, LLM training, and RAG retrieval — deliberate acts that confirm Google's knowledge and appreciation of the content it is acquiring; and (d) **Alphabet's $52+ billion AI infrastructure investment**: the scale of Alphabet's financial commitment to AI infrastructure reflects the extraordinary economic value Defendants place on the AI capabilities that depend on publisher content, confirming that Defendants appreciate the value of the benefit Plaintiff's content provides.

164. **Element Three — Inequitable Retention.** Google has accepted and retains the benefit of Plaintiff's content under circumstances that make it inequitable for Defendants to retain the benefit without payment of its value. The inequity of Defendants' retention is established by the following circumstances: (a) **Zero compensation**: Defendants have paid Plaintiff nothing for the use of his content for LLM training, RAG grounding, or AI Overviews generation. Plaintiff has received no license fee, no royalty, no revenue share, and no other form of compensation from Defendants in connection with any use of Plaintiff's content by Google's AI systems; (b) **Market rate exists**: competing AI companies — including OpenAI and others — have entered content licensing agreements with major media and publishing companies (identities to be established through discovery), paying market rates for the right to use publisher content for AI training and retrieval. The existence of these agreements demonstrates that a fair market rate for the type of content use Defendants have engaged in without compensation is commercially recognized and available; Defendants' refusal to pay market rates is not an absence of market — it is a deliberate choice to exploit monopoly power rather than participate in the market on equal terms; (c) **Direct economic harm to Plaintiff**: Defendants' retention of the benefit is directly harmful to Plaintiff, because the AI Overviews responses generated using Plaintiff's content displace Plaintiff's website from the SERP positions where it would otherwise appear, diverting the advertising revenue that would otherwise accrue to Plaintiff to Defendants — Defendants profit from Plaintiff's content while simultaneously depriving Plaintiff of the revenue that content would otherwise generate; and (d) **Absence of consent**: Plaintiff has never consented to the use of his content for LLM training, RAG

65

grounding, or AI Overviews generation. Defendants' use of Plaintiff's content for these purposes is without consent and contrary to the reasonable expectations of content publishers operating within the historic access-for-traffic exchange.

165. Under Hawaii common law, a prevailing plaintiff in an unjust enrichment claim is entitled to restitution in the amount of the benefit unjustly retained by the defendant, and disgorgement of profits the defendant has earned from the unjustly retained benefit. Durette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 504, 100 P.3d 60, 74 (2004). Plaintiff seeks: (a) Restitution equal to the fair market value of the content licensing rights misappropriated by Defendants — the market rate that Defendants should have paid for the right to use Plaintiff's content for LLM training and RAG grounding, to be determined by reference to comparable content licensing agreements entered by Google's AI competitors; and (b) Disgorgement of all advertising revenues earned by Defendants from AI Overview impressions served in response to civil law queries answered using content derived from [Plaintiff's Internet Domain(s), to be identified in discovery] as training data or RAG grounding context, to be determined through an accounting of Defendants' AI Overview advertising revenues attributable to Plaintiff's content.

166. Plaintiff is entitled to recover, and hereby seeks, the following relief in connection with Count VII: (a) Restitution equal to the fair market value of the content licensing rights misappropriated by Defendants; (b) Disgorgement of all advertising revenues earned by Defendants from AI Overview impressions served using content derived from [Plaintiff's Internet Domain(s), to be identified in discovery]; (c) An accounting of all revenues earned by Defendants from the use of Plaintiff's content; and (d) Such other equitable relief as this Court deems appropriate to prevent Defendants' unjust enrichment at Plaintiff's expense.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Theodore Haugland, appearing pro se, respectfully requests that this Court enter judgment in his favor and against Defendants Google LLC and Alphabet Inc., jointly and severally, and grant the following relief:

(a) A **declaration** that Defendants have violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, by: (i) engaging in unlawful reciprocal dealing through the coercive

66

conditioning of Search Referral Traffic on publishers providing content for republishing, AI training, and RAG use without compensation; (ii) willfully maintaining their monopoly in General Search Services through exclusionary conduct including reciprocal dealing and tortious content misappropriation; (iii) unlawfully leveraging their General Search monopoly into the Online Legal Information Publishing market; (iv) unlawfully monopolizing the General Search Services market; and (v) unlawfully attempting to monopolize the Online Legal Information Publishing market;

(b) An award of **compensatory damages** to Plaintiff for all losses to his businesses and property suffered as a result of Defendants' anticompetitive conduct, in an amount to be proven at trial, and **trebled** pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, representing three times the full amount of Plaintiff's compensatory damages for lost advertising revenue, lost search referral traffic, and lost content licensing revenue attributable to Defendants' violations;

(c) A **permanent injunction** pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, ordering that Defendants, and their officers, directors, agents, employees, affiliates, and successors, are hereby permanently enjoined from: (i) conditioning the provision of organic Search Referral Traffic, search index listing, or any Google search product or service on publishers providing their content for republishing in SERP features, AI model training, or RAG grounding use, without obtaining publisher consent and paying fair market compensation; (ii) using content crawled from publisher websites to train, fine-tune, or otherwise develop generative AI models — including but not limited to the models underlying Gemini and AI Overviews — without first obtaining from those publishers a valid license at fair market rates negotiated in good faith; (iii) using content crawled from publisher websites as real-time RAG grounding context for AI Overview responses without first obtaining from those publishers a valid license at fair market rates negotiated in good faith; (iv) displaying AI Overview responses to user queries in the Online Legal Information Publishing category that are derived from publisher content obtained without consent or compensation, until such time as Defendants have obtained valid licenses for all publisher content used in such responses; and (v) retaliating in any manner, including through changes to search ranking, crawl frequency, or search feature eligibility, against any

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

67

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

publisher that declines to provide content for republishing, AI training, or RAG use without compensation;

(d) An award of **restitution** equal to the fair market value of all content licensing rights misappropriated by Defendants from Plaintiff — the market rate that Defendants would have been required to pay in a competitive market for the right to use content from [Plaintiff's Internet Domain(s), to be identified in discovery] for LLM training, RAG grounding, and AI Overviews generation — calculated by reference to comparable content licensing agreements entered by Google's AI competitors, and determined through expert economic analysis and discovery;

(e) An order of **disgorgement** requiring Defendants to disgorge all advertising revenues and other profits earned, directly or indirectly, from AI Overview impressions served in response to civil law queries answered using content derived from [Plaintiff's Internet Domain(s), to be identified in discovery] as LLM training data or RAG grounding context, including all advertising revenues attributable to the increased user engagement with Google's SERP produced by AI Overview responses grounded by Plaintiff's content;

(f) An award of Plaintiff's **reasonable attorneys' fees and costs** of this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(g) An award of **pre-judgment and post-judgment interest** on all monetary awards at the maximum rate permitted by applicable law;

(h) An Order requiring Defendants to **provide a full accounting** of all revenue derived, directly or indirectly, from the use of content crawled from [Plaintiff's Internet Domain(s), to be identified in discovery] for purposes of LLM training, RAG grounding, and AI Overviews generation, including: (i) advertising revenues attributable to AI Overview impressions served in response to queries for which Plaintiff's content provided training data or grounding context; (ii) the monetary value of model capability improvements attributable to training data derived from Plaintiff's content; and (iii) any other form of economic value derived from Plaintiff's content by Defendants or any Alphabet subsidiary;

(i) An Order requiring Defendants to **produce in discovery** all documents and data sufficient to identify: (i) each URL crawled from [Plaintiff's Internet Domain(s), to be identified in

68

discovery] by any Google crawler between January 1, 2018 and the present, including the date, frequency, and purpose of each crawl; (ii) the specific training datasets in which content from [Plaintiff's Internet Domain(s), to be identified in discovery] was included for purposes of training, fine-tuning, or otherwise developing any Gemini model, AI Overviews model, or other Google AI model; (iii) each AI Overview response generated using content from [Plaintiff's Internet Domain(s), to be identified in discovery] as real-time RAG grounding context, including the query, the retrieved content, the generated response, and the advertising revenue generated by each such impression; and (iv) the advertising revenue generated by AI Overview impressions served in response to civil law queries answered using content from [Plaintiff's Internet Domain(s), to be identified in discovery] as training data or RAG grounding context; and

(j) Such **other and further relief** as this Court deems just, proper, and equitable under all the circumstances of this action.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff Theodore Haugland hereby demands trial by jury on all claims and issues so triable in this action, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution. Plaintiff's demand for jury trial extends to all claims asserted under the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, and the Clayton Act, 15 U.S.C. §§ 15, 26, including without limitation all claims asserted in Counts I through VI, and to all triable issues in the Hawaii common law unjust enrichment claim asserted in Count VII. This demand is timely served with this Complaint pursuant to Fed. R. Civ. P. 38(b)(1).

This Complaint is filed in good faith, based on publicly available information, judicial findings, and Plaintiff's direct personal knowledge of the harm caused by Defendants' conduct. Plaintiff respectfully requests leave to amend this Complaint as additional facts are established through discovery.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

69

Respectfully Submitted,

Date: July 2, 2026                    /s/ _Theodoe Haugland_

THEODORE HAUGLAND

99-009 Kalaloa St Ste D2016

Aiea, HI 96701-3498

Telephone: (202)933-3332

Facsimile: (202)933-3335

administrator@civillawinc.com

Plaintiff, *Pro Se*

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

70